**Johnnie ADAMS et al.**

v.

**Lou GAUDET et al.**

**Civ. A. No. 760922.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

May 27, 1981.

J. J. Cox and Rex D. Townsley, Cox & Cox, Lake Charles, La., for plaintiffs.

W. Gregory Arnette, Jr., Dist. Atty., 31st Judicial Dist., Jennings, La., Stephen J. Katz, Rankin, Yeldell, Herring & Katz, Bastrop, La., for defendants.

## OPINION

VERON, District Judge.

This matter was originally filed by the named plaintiffs, Johnnie Adams, Wilbert D. Rochelle, Melton Alfred, Margaret Oscar and Arthur Lewis, individually and as a class action claiming a broad range of allegedly discriminatory employment practices of the Jefferson Davis Parish School Board. All of the originally named plaintiffs were certified teachers employed by the Jefferson Davis Parish School Board who were serving in various professional capacities within the Jefferson Davis Parish School System. Subsequently by amended complaints, Hilda Beloney, a lunchroom worker, Dazzetta Thorne, an applicant for a clerical position, and Jessie Allison, a teacher-coach, were added as named plaintiffs. The action was brought pursuant to Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e,[1] as amended, with the original named plaintiffs having filed charges with the Equal Employment Opportunity Commission (EEOC) alleging discrimination on the basis of race. Plaintiff Margaret

---

1. The most relevant provision in Title VII is found at 42 U.S.C. § 2000e–2 which states that:

 (a) It shall be an unlawful employment practice for an employer—

 (1) to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Oscar also alleged discrimination on the basis of sex. This suit was also instituted pursuant to 42 U.S.C. Sections 1981[2] and 1983[3] and jurisdiction was invoked pursuant to 28 U.S.C. Sections 1343(3), (4), 2201, 1331, and the 14th Amendment to the United States Constitution.

In general, as this Court found in its ruling of October 11, 1977, plaintiffs asserted in their complaints that they represented the class of all employees or potential employees of defendants (the individual school board members were also sued in their individual and official capacities) who have been or will be discriminated against because of their race. It was claimed that the alleged discrimination took the form of refusal to hire certain black applicants as well as the refusal to elevate various faculty members, clerical employees, members of coaching staffs, etc. to higher positions solely because they are black. The plaintiffs also alleged that the defendants followed a policy that discouraged blacks from applying for employment or advancement. The plaintiffs moved for class certification, a hearing was held, and this Court conditionally certified a class as follows:

> "All present and former black employees and all black applicants as of or at any time after August 30, 1975, of the Jefferson Davis Parish School Board in any clerical, supervisor, principal, coach (including assistant coaches), music teacher and lunchroom manager job classifications."

**2.** 42 U.S.C. § 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other.

**3.** 42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

The original complaint of plaintiffs was filed on August 31, 1976. The originally named plaintiffs had filed charges of discrimination with the EEOC on or about August 26, 1976 and amended their original complaint on January 11, 1977 alleging that on November 15, 1976 they, that is, Johnnie Adams, . Melton Alfred, Margaret Oscar, Wilbert D. Rochelle and Arthur Lewis, received the statutory notice of right to sue from the United States Department of Justice.

The defendants thereafter moved for partial summary judgment dismissing any claims of the plaintiffs or of the plaintiff class which arose prior to August 31, 1975 which were brought pursuant to 42 U.S.C. Sections 1981 or 1983 and any claims which may have been alleged which arose more than 180 days prior to the date of the filing of plaintiffs' charges with the EEOC. In addition defendants moved that all claims for relief in the nature of back-pay or other monetary damages were barred by the passage of the statute of limitations for any claim that arose prior to August 31, 1975. The Court granted the defendants' motion for partial summary judgment. This matter was then set down for trial and trial commenced on September 10, 1980 and concluded on September 24, 1980.

Plaintiffs allege that they were victims of purposeful racial discrimination (disparate treatment) and also that the employment policies of the Jefferson Davis School Board had a disproportionate exclusionary impact (disparate impact) upon them as blacks.[4]

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**4.** The Supreme Court has explained the distinction between "disparate treatment" and "disparate impact" as follows:

> 'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . .

In deciding the merits of those allegations, we will first review the law applicable to plaintiffs' claims of purposeful racial discrimination and then apply that law to the evidence presented in connection with the various positions which plaintiffs claim they were denied because of their race. We will then consider plaintiffs' claims that the employment procedures used by the defendants had a disproportionate exclusionary impact on blacks.

## I. PURPOSEFUL DISCRIMINATION

### (Disparate Treatment)

To establish a prima facie case of purposeful racial employment discrimination under Title VII the Supreme Court has held that a plaintiff must present evidence from which an inference may be drawn that he was denied a job because of his race. *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1971). While the *McDonnell Douglas* decision acknowledged that the proof necessary to raise such an inference will vary from case to case, the Court suggested that a plaintiff could satisfy his initial burden with evidence showing "(i) that he belongs to a racial minority, (ii) that he applied and was qualified for a job for which the employer was seeking applications, (iii) that despite his qualifications, he was rejected, and (iv) that after his rejection the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications." *Id.* at 802, 93 S.Ct. at 1824.[5]

In this Circuit, if the employer has a history of racial discrimination, such history may be a component in a plaintiff's prima facie case. In *Lee v. Washington County Bd. of Education*, 625 F.2d 1235 (5th Cir.

---

Claims of disparate treatment can be distinguished from claims that stress 'disparate impact.' The latter involve employment practices which are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity .... Proof of discriminatory motive, ... is not required under a disparate impact theory. *Teamsters v. U. S.*, 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 346 (1977). For an enlightening discussion of the distinction between the two theories *see*, Friedman, *The Burger Court and the Prima Facie Case in Employment Discrimination Litigation: A Critique*, 65 Corn.L.Rev. 1, 3–15 (1979).

**5.** Although the *McDonnell Douglas* decision concerned a claim of purposeful discrimination brought pursuant to Title VII only, the *McDonnell* test would seem to be relevant to claims of racial discrimination brought under the Constitution and 42 U.S.C. Sections 1981, 1983. As with Title VII claims premised upon a theory of disparate treatment, claims based upon the Constitution, 1981, and 1983 require some showing by the plaintiff that the defendants acted with a discriminatory motive, *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), (Constitutional claims), *Williams v. Dekalb County*, 582 F.2d 2 (5th Cir. 1978), applying *Washington v. Davis* intent requirement to 1981, 1983 cases). When plaintiffs such as those in this case assert claims under Title VII, 1981, 1983, and the Constitution, a question which naturally arises is whether or not evidence satisfying their prima facie burden under Title VII also establishes a prima facie case for their 1981, 1983 and Con-

stitutional claims. That question is the subject of some debate in this and other circuits. *See, Ramirez v. Sloss*, 615 F.2d 163, 168 n.7 (5th Cir. 1980) (prima facie case under 1981 or 1983 may require elements of proof in addition to those sufficient to establish a prima facie case under Title VII), *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) (when Section 1983 is used as parallel remedy with Title VII in racial discrimination suit, the elements of a cause of action are the same under both statutes); *Lee v. Conecuh County Bd. of Ed.*, 634 F.2d 959, 961–62 (5th Cir. 1981) (5th Circuit has never explicitly decided whether the elements of a prima facie case are the same under Title VII and 1981, 1983); *see also Scott v. University of Delaware*, 601 F.2d 76, 80–81 (3rd Cir.) cert. denied, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979) (intent requirement in cases brought under the Constitution the same as motive requirement in Title VII disparate treatment cases and 1983 suits). While we view the question as a hair most worthy of appellate splitting, we are of the opinion that if purposeful racial discrimination is violative of all the provisions in question, then evidence such as that suggested in *McDonnell Douglas*, which raises an inference that an individual was the victim of purposeful discrimination, establishes a prima facie case regardless of what the statutory or constitutional basis of that individual's claim may be. We therefore feel that if the plaintiffs in this case presented evidence raising an inference that they were denied jobs because of their race they established a prima facie case for all their claims.

1980) a case involving black public school teachers claiming that they were denied promotions because of their race, the court held that proof of an immediate past history of racial discrimination would alone be sufficient to shift the burden to the local school board to explain their decisions. If the history of racial discrimination was more remote in time to when the challenged decisions were made, the *Lee* court held that it would still be relevant evidence but that some other evidence of discrimination was necessary to establish a prima facie case. Such other evidence was provided in *Lee* in the form of statistics showing that few if any black teachers were promoted into certain positions from the time the school system was ordered desegregated until the time suit was filed.[6]

██ In the present case the Jefferson Davis School Board has a history of racial discrimination. Until ordered by this court to desegregate in 1970, *see Gordon v. Jefferson Davis Parish School Board*, 315 F.Supp. 901 (W.D.La.1970), a dual system of schools was maintained in the parish for white and black children. While we are uncertain as to whether this history may be considered an immediate past history of discrimination [7] and if so, whether plaintiffs would nonetheless have to prove as a part of their prima facie case that they were qualified for the jobs they sought,[8] we assume that the history of racial discrimination in Jefferson Davis Parish when paired with the statistical evidence offered by plaintiffs established a prima facie case of racial discrimination in connection with some jobs [9] and thus shifted to the defendants the burden of explaining their decisions.

In *McDonnell Douglas* the Supreme Court held that a Title VII defendant may rebut a plaintiff's prima facie case by articulating "some legitimate, non-discriminatory reason" for the employment decisions at issue. *Id.* 411 U.S. at 802, 93 S.Ct. at 1824. In *Texas Dept. of Community Affairs v. Burdine*, —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court held that *McDonnell Douglas* does not require a defendant to prove by a preponderance of the evidence that the reasons articulated were in fact those which governed the decision.[10] In explaining what *McDonnell*

---

6. The statistics offered by the plaintiff in *Lee* showed that "all fourteen of the head athletic coaches and sixteen of the eighteen assistant athletic coaches hired by the Board between 1970–71 and 1976–77 were white. It also introduced evidence showing that in 1970 whites held all four positions on the Board's central staff and that the Board filled each vacancy occurring since 1970 with a white applicant." *Id.* at 1237.

7. In *Lee*, the Court concluded that the schools there involved did not have an immediate past history of racial discrimination. Apparently, as a part of the proceeding giving rise to the appeal, the district court had issued an order declaring that the schools were in compliance with its initial desegregation order and were thus functioning as a desegregated, unitary system. In a similar case, the Fifth Circuit suggested that if at the time of suit the schools were operating under a federal injunction against de jure segregation, that fact constituted an immediate past history of discrimination. *See, Lee v. Conecuh County Bd. of Ed.*, 634 F.2d 959 (5th Cir. 1981).

 The Jefferson Davis Parish School System was operating under a federal order ending de jure segregation at the time suit was filed but plaintiffs concede that the School Board has been in compliance with that order since the time it was entered. We thus have some difficulty concluding that the Jefferson Davis Parish School system has an immediate past history of racial discrimination even though that conclusion may be warranted by the *Conecuh* decision.

8. In passing Title VII, Congress did not intend to compel employers to hire persons protected by Title VII even if they were not qualified for the jobs being offered. It would seem to follow that Congress also did not intend to have employers in court defending suits brought under Title VII by people who could not demonstrate that they were qualified for a job at issue. We thus assume that even if an employer has an immediate past history of racial discrimination, a plaintiff is not entitled to relief unless he can demonstrate as part of his prima facie case that he was qualified for the job he was seeking.

9. The statistics offered by plaintiffs will be discussed at the beginning of our review of the various job categories at issue in this case.

10. Prior to the *Burdine* decision the rule in this circuit was that an employer could not rebut a plaintiff's prima facie case of employment dis-

*Douglas* requires of a defendant, the *Burdine* court stated that "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at —— U.S. at ——, 101 S.Ct. at 1096.

The *Burdine* Court also held that the employer defendant need not offer comparative evidence showing that the person chosen for a given job was more qualified than a plaintiff who was rejected.[11] In that regard the Court noted that Title VII does not require an employer to give preference to an employee protected by Title VII "whenever that [employee's] objective qualifications [are] equal to those of a white male applicant." *Id.* —— U.S. at ——, 101 S.Ct. at 1097. The court went on to state that "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Id.*[12]

While the *Burdine* Court did not directly state that a defendant must offer proof that the person chosen for a job was as objectively qualified for the position as the plaintiff, such a requirement may be inferred from the decision for two reasons.

First, if the employer did not offer such evidence, the trier of fact would have difficulty rationally concluding that the employment decisions were not motivated by discriminatory animus. Secondly, the Court speaks of an employer having discretion to choose between equally qualified candidates for the job. Presumably, unless the candidates were equally qualified, an employer would not have such discretion or at least if he did, he would not be able to exercise it in favor of a less qualified candidate without risk of liability to a more qualified candidate protected by Title VII. Since legitimate non-racial factors which influenced the exercise of an employer's discretion are what must be articulated in order to rebut a plaintiff's prima facie case, we assume that an employer could not do so unless he could show that his decision was made in a context which afforded him the discretion to choose between the plaintiff and the person chosen. Because that discretion would seem to exist only when the plaintiff and the person chosen are objectively equally qualified for the job, it would follow that the defendant must offer evidence which would permit the fact finder rationally to conclude that the employer's decision was

crimination unless he proved by a preponderance of the evidence that his rejection of the plaintiff was actually based upon legitimate non-discriminatory reasons. *See, Turner v. Texas Instruments Inc.*, 555 F.2d 1251, 1255 (5th Cir. 1977).

11. In addition to or as a part of the requirement that an employer had to rebut plaintiff's prima facie case by a preponderance of the evidence, this Circuit, prior to the *Burdine* decision, required an employer defending an employment discrimination suit to offer comparative evidence showing that the person chosen instead of a plaintiff was more qualified than the plaintiff. *See East v. Romine, Inc.*, 518 F.2d 332, 339–340 (5th Cir. 1975).

12. Like the *McDonnell Douglas* decision, *Burdine* involved only a Title VII claim. We thus cannot find explicit guidance in that opinion concerning a defendant's intermediate burden in employment discrimination suits brought pursuant to statutory and constitutional provisions other than Title VII. We note, however, that in this Circuit, in cases where individual claims of employment discrimination are based on 1981, 1983 and Title VII, no distinction has

been drawn between an employer's Title VII intermediate burden and his 1981, 1983 intermediate burden. *See Lee v. Conecuh Bd. of Ed.*, 634 F.2d 959 (5th Cir. 1981). Indeed the precedential genesis of the requirement, overruled in *Burdine*, that a defendant must prove legitimate non-discriminatory reasons for his decisions by a preponderance of the evidence, was a case where the plaintiff had asserted his claim of employment discrimination under Title VII and 1981. *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251 (5th Cir. 1977). We thus assume that if a defendant offers evidence which, under *Burdine* is sufficient to rebut a plaintiff's Title VII prima facie case, he also rebuts any prima facie case of employment discrimination which the plaintiff may have established under another provision. Our assumption finds support in a recent post-*Burdine* decision by the Fifth Circuit where the plaintiff sued under both Title VII and 1981 and the court analyzed the defendant's efforts to rebut plaintiff's prima facie case in accordance with the *Burdine* decision standards. *Robbins v. White-Wilson Medical Clinic, Inc.*, 642 F.2d 153 (5th Cir. 1981).

made in such a context. *See Robbins v. White-Wilson Medical Clinic, Inc.*, 642 F.2d 153 (5th Cir. 1981).

Assuming then that an employer may not rebut a plaintiff's prima facie case unless he offers some evidence which would permit the court to conclude that the person chosen was as objectively qualified for the job as the plaintiff, we must consider what the defendant must offer in the way of a standard against which the qualifications of the candidates may be measured. We are guided in determining what a proper standard may be in this case by two recent decisions rendered by the Fifth Circuit Court of Appeals in cases similar to this one. In *Lee v. Conecuh County Bd. of Ed.*, 634 F.2d 959 (5th Cir. 1981), a black public school teacher in Alabama claimed that he was denied several principalships because of his race. The State of Alabama required that before a teacher could be made a principal, he had to be specially certified by the state. Presumably to be certified a teacher either had to pass a test or satisfy certain objective academic and work experience requirements e. g., a master's degree plus five years teaching experience. The Plaintiff in *Conecuh* was properly certified but the white individuals who received the principalships for which he applied were not. The school board had adopted no criteria to be used in lieu of the state requirements which it chose to ignore. In evaluating the school board's efforts to articulate legitimate non-racial reasons for their decisions, the *Conecuh* Court noted that:

> The defendants' ability to prove legitimate reasons for their decision was undermined by their failure to adopt written, objective criteria for selecting principals. The trial court stated that it was unable to conclude whether [the plaintiff] was better qualified than white candidates for principalships 'for the Board has not adopted any such non-racial objective

criteria and until this is done the Court will never be in a position to adequately consider the propriety of any principal selection made by the Board.' The defendant's contention that they acted for legitimate reasons could therefore not rest on the assertion that any of the applicants chosen were more qualified than [the plaintiff] and it was impossible for them to carry the burden of proving that 'those hired or promoted were more qualified than the plaintiff.' *Falcon v. General Telephone Company of the Southwest*, 626 F.2d [369] at 378 [5th Cir. 1980]

*Id.* at 963.

Although in the wake of *Burdine*, a school board need no longer prove that the person hired was more qualified than the plaintiff, the *Conecuh* Court's discussion of written objective criteria is still relevant to our determination of what standard our defendants must offer to show that the persons they promoted were as qualified as the plaintiffs. However, to read that portion of the decision as imposing an extremely heavy burden on school boards which have not developed their own set of written objective criteria but which adhere to the state standards would seem to bring the decision into conflict with the holding in *Hereford v. Huntsville Bd. of Ed.*, 574 F.2d 268 (5th Cir. 1979).

In *Hereford*, another Alabama case involving alleged discrimination in the promotion of black public school teachers, the plaintiffs had urged the court to require the local school board to adopt and use objective criteria for promotion decisions. cf. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969) cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1969), (objective criteria must be used in making *demotions* resulting from integration related staff reductions).[13] The

---

13. The plaintiffs in this case have asked us to require the School Board to adopt and use objective criteria for promotion decisions. Through their expert, Dr. Williams, the plaintiffs proposed a set of criteria and a method of making decisions which they felt would be fair

and nondiscriminatory. However, as defendants' counsel skillfully demonstrated during his cross-examination of Dr. Williams, use of the criteria he proposed for the job decisions here in question would have resulted in either the same or some other white applicant being cho-

*Hereford* court rejected plaintiffs' argument holding that *Singleton* was not applicable to promotions. The court further noted that "in filling job vacancies, a school board's decisions may be based on certain subjective factors such as an applicant's knowledge of his subject, philosophy on education and life in general, appearances, leadership ability and aggressiveness." *Id.* at 270.

The *Hereford* Court's specific rejection of the plaintiffs' argument that the school board there involved be required to adopt and use objective criteria seems to be contrary to the *Conecuh* Court's apparent conclusion that without such criteria a school board would have a difficult if not impossible task in trying to rebut a plaintiff's prima facie case. Since the *Conecuh* court did not overrule *Hereford* but indeed, cited it favorably, as have other courts,[14] we must assume that the two decisions may be reconciled with one another. To that end it is important to note that unlike the *Conecuh* court, the court in *Hereford* gave no indication that the defendants in that case had promoted uncertified white applicants over certified black applicants. Since it is unlikely that such a practice would have gone unnoticed by the court, we feel we may assume that the teachers receiving promotions in *Hereford* were properly certified for the jobs they received. If that is true then the *Hereford* decision would seem to approve subjective factors being taken into account whenever a school board must choose between candidates who, by the

standards established by the state, are equally qualified for the job being offered. Such a conclusion is warranted by the fact that in the absence of local objective criteria, the only official objective qualifications for any job at issue would have been those established by the state. It is doubtful that the court would have approved employment decisions based on subjective factors unless some evidence existed showing that the persons chosen were objectively qualified for the position. The only means available in *Hereford* for making such a showing would have been the standards developed by the state.

■ Our examination of *Hereford* and *Conecuh* leads us to conclude that they can best be reconciled with one another by applying them in different contexts. In this regard, we feel that the *Conecuh* decision would be most applicable in cases where the evidence shows that, judged by the governing standards for the job in question, the plaintiff was clearly more qualified than the person who received the job. In that context, the case can be read consistently with *Burdine* as imposing an extremely heavy burden upon the defendant who attempts to justify his actions with proof that his decisions were based on potentially proper subjective considerations. However, in cases where the defendants can show that by the standards governing the job, the person promoted was as qualified as the plaintiff, we feel that the *Hereford* decision

sen more often than not. While that fact alone would not warrant an out of hand rejection of objective criteria, it does point up the difficulty encountered when one attempts to develop such criteria. Much of that difficulty springs from the fact that the skills required for being a good teacher, coach or administrator of a school, are not easily quantified and thus amenable to objective measurement. For positions requiring similar abstract skills it has been noted that "decisions about hiring and promotion ... cannot realistically be made using objective standards alone." *Rogers v. International Paper Co.*, 510 F.2d 1340, 1345 (8th Cir. 1975) (supervisory and managerial positions). When we add to the difficulty of developing meaningful objective criteria the policy of allowing "the internal affairs of a local school system [to] be administered by its elected or appointed au-

thorities [rather than] by federal courts" *Lee v. Washington County Board of Ed.*, 625 F.2d 1235, 1237 (5th Cir. 1980), we become extremely reluctant to require the defendants in this case to develop and use for promotion and hiring decisions any objective criteria beyond those already established by the Louisiana Department of Education.

14. In *Davis v. Board of School Com'rs of Mobile County*, 600 F.2d 470 (5th Cir. 1979), the court cited *Hereford* for the proposition that in evaluating evidence concerning the relative qualifications of teachers applying for principalships, a district court need not limit its analysis to objective qualifications but may take into account permissible subjective factors.

and *Burdine* should apply, enabling the defendants to justify their decisions with evidence that they were based on legitimate non-racial subjective factors.

■ In this case we feel that the governing standards for the jobs under review are provided by the Louisiana Department of Education. That department is the state agency responsible for the administration of the Louisiana public school system. It has developed standards governing the qualifications which a teacher must possess in order to be employed in various positions at public schools in the state. Those standards require that before a teacher may be employed in a given position he must possess a valid Louisiana teacher's certificate upon which appears an endorsement authorizing him to be employed in that position. *See* Dept. of Ed. Bulletin 746, *Louisiana Standards for State Certification of School Personnel,* 3 (1976). To receive such an endorsement the teacher must satisfy objective requirements established by the department. *Id.* at 7. Those requirements are based on the teacher's educational background and teaching experience.

■ A local school board may hire any teacher whose certificate includes an endorsement authorizing that teacher to be employed in the position being filled. So far as the State Department of Education is concerned any teacher whose certificate includes an endorsement authorizing him to be employed in a given job, is as objectively qualified for that position as any other teacher whose certificate includes the same endorsement. Because they have a greater expertise in such matters than we do, we defer to the judgment of the Department of Education concerning the qualifications which a teacher must possess in order to be employed in various positions.[15] Accordingly, to the extent that the *Burdine* decision may require a defendant to show that the

person chosen for a job was as qualified as the plaintiff, we feel that the defendants in this case may satisfy that element of their burden with proof that the teacher hired for a given position possessed a teacher's certificate upon which appeared an endorsement authorizing him to be employed in that position.

■ In applying the foregoing discussion to the case at hand we feel that with regard to the various promotions challenged by the plaintiffs we should first determine whether the person selected for the position possessed the qualifications required by the standards governing the job. Next we will consider whether the black applicants for that position also possessed the requisite qualifications. If we find that the person selected and one or more black applicants possessed the requisite qualifications we will then evaluate the reasons offered by the defendants in light of the *Burdine* and *Hereford* decisions. Should we find that the defendants have articulated legitimate non-racial reasons for their decisions, we will examine the evidence offered by plaintiffs to show that the reasons given by the defendants were merely a pretext for discrimination. *See McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine, supra,* at —— U.S. at ——-——, 101 S.Ct. at 1092–1093. Our examination begins with the system-wide supervisory positions and proceeds through the other disputed decisions and claims in this case.

## A. SUPERVISORY POSITIONS

■ The supervisory positions at issue in this case are those which must be occupied by a certified teacher, and for which the Louisiana Department of Education has developed requirements which must be satisfied before a teacher may be authorized to be employed in those positions. We thus

---

**15.** When it comes to the qualifications of teachers, federal courts have traditionally been reluctant to substitute their judgment for that of state or local officials having a greater expertise in such matters. *See Blunt v. Marion County School Board,* 515 F.2d 951, 956 (5th Cir. 1975); *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970); *Callahan v. Price,* 505 F.2d 83, 88 (5th Cir. 1974); *Lee v. Macon County Board of Education,* 490 F.2d 458 (5th Cir. 1974); *Green v. Board of Regents of Texas Tech. University,* 335 F.Supp. 249 (N.D.Tex.1971), aff'd 474 F.2d 594 (5th Cir. 1973).

reject plaintiffs' argument, raised for the first time at trial, that Title I co-ordinators and directors be considered Supervisors. Aside from the fact that no evidence was introduced showing that a director or a co-ordinator actually supervised anyone within the school system who was not a part of a Title I program, the requirements which must be satisfied to be employed as a director or co-ordinator are entirely different from those which must be satisfied in order for a person to be employed as a supervisor. *See Price v. Franklin Parish School Board*, 389 So.2d 430 (La.App.1980). The two types of jobs are therefore distinct from one another and as a result we hold that directors and co-ordinators of Title I programs are not included in the class of supervisors conditionally certified by this court.

■ With regard to the superintendent and supervisor positions under consideration in this case, the statistics offered by the plaintiffs show that of the seven supervisors and superintendents employed by the defendants immediately prior to this suit being filed in August, 1976, six were white and one was black.[16] The statistics also show that of the nine persons promoted to supervisory positions between the date of desegregation, June 8, 1970 and the date suit was filed, eight were white and one was black.[17] To arrive at those figures the plaintiffs counted the promotion of Louis Gaudet from a supervisor to Superintendent as two promotions. Their reason for doing so is that Gaudet was first made an Assistant Superintendent and then two years later the Superintendent. However the evidence is clear that Gaudet was cho-

sen to be Superintendent first and merely served as an Assistant Superintendent to prepare him for assuming the responsibilities of the other job. The school typically employs only one Assistant Superintendent but while Gaudet was an Assistant Superintendent the School Board employed another individual as an Assistant Superintendent. When that person retired and Gaudet was made Superintendent, the School Board returned to its previous practice of having one Assistant Superintendent. For that reason, we find that Gaudet's service as an Assistant Superintendent and his ultimate assumption of the Superintendent's responsibilities, were but a single promotion whereby he became Superintendent after first receiving something akin to on the job training.

■ Whether we treat Gaudet's advancement from a supervisor to Superintendent as one or two promotions, the statistics offered by plaintiffs, plus the school system's history of racial discrimination raise an inference, albeit a feeble one,[18] that between desegregation and the time suit was filed the School Board discriminated against black applicants for supervisory positions. *See Lee supra.* We must therefore consider the evidence presented by the defendants with regard to the supervisory promotions occurring during the time relevant to plaintiffs' claims i. e. August 30, 1975 through the date of trial, September 1980.

The evidence showed that between August 30, 1975 and the date of trial, the Jefferson Davis Parish School Board filled through promotion four vacancies occurring in its system-wide supervisory staff.[19]

---

**16.** See, Plaintiffs' Exhibit 54 reproduced in the appendix to this opinion.

**17.** See, Plaintiffs' Exhibit 55 reproduced in the appendix to this opinion.

**18.** We have some question about whether the sample size upon which the plaintiffs' statistics are based is sufficiently large to justify any inference of discrimination. *See, Teamsters v. U. S.*, 431 U.S. 324, at 339, n. 20, 97 S.Ct. 1843, at 1856 n. 20, 52 L.Ed.2d 396 (1977); *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978). Had only one more black been chosen as a supervi-

sor the percentage of those positions awarded to blacks would have equaled the percentage of Jefferson Davis Parish teachers authorized to hold such positions who were black. A disparity dependent upon one decision does not too great an inference raise. Furthermore, the statistics did not indicate how many blacks applied for the positions. We thus do not know if whites were chosen over black applicants.

**19.** Since Gaudet's selection as a Superintendent occurred in July, 1974, we do not count his as a promotion occurring after August 30, 1975 even though he did not actually assume the

Those vacancies occurred in the following positions: Assistant Superintendent, Supervisor of Secondary Instruction (hereinafter referred to occasionally as Supervisor of Secondary Education), Supervisor of Child Welfare and Attendance and Supervisor of Special Education.

## 1. ASSISTANT SUPERINTENDENT

During the summer prior to the 1976–77 school year, the Jefferson Davis Parish School Board solicited and received applications for the position of Assistant Superintendent of Schools.[20] After interviewing each applicant for the job, the Board by secret ballot selected Allen Fitzgerald.[21] Mr. Fitzgerald is white and was at the time of his selection authorized to be employed as an Assistant superintendent.[22] The two black applicants for the position, Melton Alfred and Wilbert Rochelle, were also authorized to be so employed. We must therefore consider the reasons offered by the defendants for their selection of Mr. Fitzgerald.

The evidence revealed that the Assistant Superintendent is the second highest professional position within the Jefferson Davis Parish School system. The person in that position has administrative responsibilities extending to every facet of the system.

The evidence also showed that experience as a supervisor of education provides the best background for assuming the responsibilities of the Assistant Superintendent. A supervisor of education is responsible for the system-wide administration of an educational program offered by the parish school system, e. g. high schools, grade schools, etc. Though not as extensive, the administrative responsibilities of a supervisor are more comparable to those of the Assistant Superintendent than are the responsibilities of any other professional position in the parish schools save that of the Superintendent. Because of that we feel that the three supervisors of education who applied for the Assistant Superintendent position were the most qualified applicants for the job. Those three individuals were Allen Fitzgerald, Supervisor of Secondary Education, Plaintiff Wilbert Rochelle, Supervisor of Special Education and Freddie Whitford, Supervisor of Elementary Education.

■ By our finding that the above named supervisors were the most qualified applicants for the position of Assistant Superintendent we also find that Melton

---

responsibilities of the job until sometime after that date.

**20.** Seven people applied for the job, including five white individuals, W. F. Whitford, Allen Fitzgerald, Jimmy Spears, Nathan Avant, Jr., and J. E. Harelson, and two black individuals, Wilbert D. Rochelle and Melton Alfred.

**21.** There were thirteen members on the School Board at the time including one black individual. The vote in this instance was seven votes for Allen Fitzgerald and six for W. F. Whitford, the Supervisor of Elementary Education.

**22.** An Assistant Superintendent must be authorized to be employed as a supervisor. To be so authorized the Louisiana Department of Education requires that:

"[t]he applicant must hold a valid Type A Louisiana teaching certificate.

The applicant must have had 5 years of successful professional school experience, 3 years of which must have been during the 5 year period immediately preceding appointment to the supervisory position.

The applicant must hold a master's degree from a regionally accredited institution in-

cluding 12 semester hours of professional education at the graduate level, 9 hours of which shall include courses in supervision, curriculum and instruction, and 3 hours in school administration."

Dept. of Ed. Bulletin 746, *Louisiana Standards for State Certification of School Personnel* 40 (1976).

With regard to a "Type A" teacher's certificate the standards provide:

A Type A certificate is based upon a baccalaureate degree including completion of a teacher education program approved by the State Board of Elementary and Secondary Education, with credits distributed as hereinafter provided, including general, professional, and specialized academic education, a master's or higher degree from an approved institution and 5 years of successful teaching experience in the properly certified field. The experience must be validated by the employing authority. This certificate is valid for life for continuous service for services endorsed thereon.

*Id.* at 4.

Alfred was not denied the job because of his race. Having spent his entire career as a classroom teacher, Alfred had no administrative experience of any consequence and certainly none which provided him with as good a background for assuming the extensive responsibilities of the Assistant Superintendent as that gained by those applicants with experience as supervisors. Since one of the applicants with supervisory experience was black, we find that with regard to Melton Alfred, defendants rebutted his prima facie case with evidence which permits us rationally to conclude that their decision to hire a person with supervisory experience was based on legitimate non-racial reasons and was not motivated by a discriminatory animus.

 Having concluded that Alfred was not denied the job because of his race, the balance of our consideration of this claim is devoted to the reasons offered by the defendants for their selection of Fitzgerald over Rochelle. The defendants claim that they chose Fitzgerald rather than Rochelle because Fitzgerald had demonstrated during school board meetings a greater knowledge of matters within the realm of his responsibilities than had Rochelle.

The evidence showed that during school board meetings members of the school board would often ask the supervisors questions about matters related to those areas of the school system for which the supervisor was responsible. Members of the school board testified that Fitzgerald would always respond to those questions with an answer but Rochelle would request time to check into the matter promising that an answer would be forthcoming at a later time.

The significance of the difference between how Fitzgerald and Rochelle answered those questions lies in the difference between their responsibilities as supervisors. The evidence showed that the number of students and faculty involved in programs administered by Fitzgerald as Supervisor of Secondary Education was greater

than the number involved in programs administered by Rochelle as Supervisory of Special Education. Because of that, Fitzgerald's job entailed greater administrative responsibilities than did Rochelle's position. As a consequence, the difference between the promptness with which Rochelle and Fitzgerald answered questions led the school board to conclude that Fitzgerald not only had a better knowledge of matters for which he was responsible but also that he was more able than Rochelle to assume the extensive responsibilities of the Assistant Superintendent.

As noted by the *Hereford* Court, an applicant's knowledge of his subject is a legitimate non-racial reason upon which a school board may base a promotion decision. The uncontroverted testimony of members of the Jefferson Davis Parish School Board was that they chose Allen Fitzgerald over Wilbert Rochelle because they perceived Fitzgerald as being more knowledgeable about matters for which he was responsible than was Rochelle. We therefore find that the defendants rebutted plaintiffs' prima facie case with evidence which permits us rationally to conclude that their decision to choose Allen Fitzgerald as the Assistant Superintendent was based on legitimate non-racial reasons and was not motivated by discriminatory animus.

 The plaintiffs offered no evidence suggesting that the reasons offered by the defendants were a mere pretext for discrimination. We therefore find that the plaintiffs Melton Alfred and Wilbert Rochelle failed to prove by a preponderance of the evidence that they were denied the job of Assistant Superintendent because of their race.

### 2. SUPERVISOR OF SECONDARY EDUCATION

 During the summer prior to the 1976–77 school year, the Jefferson Davis Parish School Board solicited and received applications for the position of Supervisor of Secondary Education.[23] After interview-

---

**23.** Eleven persons applied for the job including eight white individuals, J. E. Harelson, Malon

Dobson, Paul DeLaCroix, Helena Hawthorne, Louie A. Moore, Jimmy W. Spears, Gene Al-

ing each applicant for the job, the board by secret ballot selected Mr. J. E. Harelson.[24] Mr. Harelson is white and was at the time of his selection authorized to be employed as a Supervisor of Secondary Education.[25] Two black teachers who applied for the job, Melton Alfred and Birdell Perkins, were also authorized to be so employed. The only other black applicant, plaintiff Michael Lavan, was not at that time authorized to be employed as a supervisor. His claim that he was denied the job because of his race is therefore without merit because he was not qualified for the position. However, since Perkins and Alfred were qualified, we must consider the reasons offered by the defendants for their selection of Harelson.

■ The defendants claim that Harelson was chosen because of his extensive administrative experience at the high school level. The evidence revealed that for eleven years prior to his promotion, Harelson had been the principal of Jennings High School, the largest high school in Jefferson Davis Parish. Since the Supervisor of Secondary Education is responsible for the system-wide administration of the parish high schools, Harelson's experience as principal at the largest high school in the parish provided him with the best background of all the applicants for assuming the responsibilities of the Supervisor of Secondary Education.

The evidence showed that Perkins and Alfred did not have administrative experience at the high school or any other level. Both had spent their entire careers as classroom teachers. White applicants for the job had similar backgrounds.[26] They too were not chosen to be Supervisor of Secondary Education. We therefore find that the defendants rebutted plaintiffs' prima facie case with evidence which permits us rationally to conclude that their decision to choose J. E. Harelson as Supervisor of Secondary Education was based on legitimate non-racial reasons and was not motivated by discriminatory animus.

■ The plaintiffs offered no evidence suggesting that the reasons offered by the defendants were a mere pretext for discrimination. We therefore find that the plaintiffs, Melton Alfred, Birdell Perkins and Michael Lavan, failed to prove by a preponderance of the evidence that they were denied the job of Supervisor of Secondary Education because of their race.

### 3. SUPERVISOR OF CHILD WELFARE AND ATTENDANCE

■ During the summer prior to the 1976–77 school year, the Jefferson Davis Parish School Board solicited and received applications for the position of Supervisor of Child Welfare and Attendance.[27] After interviewing each applicant for the job, the board by secret ballot selected Mr. Virgil Perrin.[28] Mr. Perrin was authorized to be employed as a Supervisor of Child Welfare and Attendance.[29] The two black appli-

---

cock and Jack D. Martin, and three black applicants, Melton Alfred, Michael Lavan and Birdell Perkins.

**24.** The thirteen members of the School Board voted with eight votes being cast for Harelson and five for Louie A. Moore.

**25.** The requirements for this position are the same as those applicable to the Assistant Superintendent, *see* n. 22 *supra*.

**26.** Helena Hawthorne and Jack Martin had never served in an administrative capacity. Every other white applicant had.

**27.** Ten persons applied for the job including eight white individuals, Virgil Perrin, Malon Dobson, Gene A. Alcock, Jack D. Martin, Richard Sockrider, Jimmy W. Spears, W. P. Buck

and J. E. Harelson, and two black individuals, Margaret Oscar and Michael Lavan.

**28.** The vote was eight to five in favor of Perrin.

**29.** To be authorized to be employed as a Supervisor of Child Welfare and Attendance, the Louisiana Department of Education requires that:

"The applicant must hold a valid Type A Louisiana teaching certificate.

The applicant must have had 5 years of successful professional school experience, 3 years of which must have been during the 5 year period immediately preceding appointment to the position.

The applicant must hold a master's degree from a regionally accredited institution in-

cants for the job, Margaret Oscar and Michael Lavan, were not authorized to be so employed. We thus find that the evidence permits us to conclude that Lavan and Oscar were denied the job for the legitimate non-racial reason that they were not qualified for the position and that their rejection was not motivated by a racial, or in the case of Mrs. Oscar, a sexual, discriminatory animus.

The plaintiffs neither did nor could they offer evidence suggesting that the reasons offered by the defendant were a mere pretext for discrimination. We therefore find that the plaintiffs Margaret Oscar and Michael Lavan failed to prove by a preponderance of the evidence that they were denied the position of Supervisor of Child Welfare and Attendance because of their race or with Oscar, her sex.

### 4. SUPERVISOR OF SPECIAL EDUCATION

■ During the summer prior to the 1979–80 school year, the Jefferson Davis Parish School board solicited and received applications for the position of Supervisor of Special Education.[30] Upon the recommendation of Louis Gaudet, the School Board selected Ms. Mary Ellen Hawkins for the job. Ms. Hawkins is white and the evidence shows that she was authorized to be employed as the Supervisor of Special Education.[31] Johnnie Adams, the only black applicant for the position, reluctantly admitted during his trial testimony that he was not authorized to be employed as the Supervisor of Special Education.[32] We thus need not consider the reasons offered by the defendants for their selection of Ms. Hawkins. Adams' claim that he was denied the job because of his race is without merit.

### B. PRINCIPALSHIPS

■ The statistics presented by the plaintiff showed that between desegregation and the time suit was filed, all of the ten principalships filled through promotion were awarded to white teachers.[33] The statistics also showed that of the fifteen principalships existing immediately prior to the filing of this suit, thirteen were occupied by white teachers and two were occupied by black teachers.[34] These statistics, when paired with the school system's history of racial discrimination, raises the inference that black applicants for principalships may have been denied the jobs because of their

---

cluding 12 semester hours of professional education at the graduate level. These 12 hours shall include 3 semester hours in Visiting Teacher work. The remaining 9 hours shall include courses in supervision and administration."

La.Dept. of Education Bulletin 746, *supra* at 41.

**30.** Nine individuals applied for the job. All except Johnnie Adams were white. The white applicants were, Mary Ellen Hawkins, Dalton Newman, Alezenia Stitzlein, David Patout, Wm. N. Gunnell, Gerald Garns, Joyce C. Sigler and Cumalee Kirk.

**31.** To be authorized to be employed as a Supervisor of Special Education, standards developed by the Louisiana Department of Education require that:

"The applicant must hold a valid Type A Louisiana teaching certificate.

The applicant must have had 5 years of successful professional school experience, in both regular and special education; 3 years in special education must have been during the five year period immediately preceding appointment to the supervisory position.

The applicant must hold a master's degree from an accredited institution including 12 semester hours of professional education at the graduate level, 9 hours of which shall include courses in supervision, curriculum and instruction, and 3 hours in school administration.

The applicant must hold generic certification in Special Education and/or certification in two areas of exceptionality.

Individuals presently serving in this capacity must meet requirements by February 20, 1980. Individuals hired between February 20, 1977 and February 20, 1980 must meet requirements when employed.

La.Dept. of Ed. Bulletin 746, *supra* at 45–46.

**32.** Only three of the nine applicants for the position, Mary Ellen Hawkins, William N. Gunnell and Gerald Garns, were authorized by the State to be employed as a Supervisor of Special Education.

**33.** See Plaintiffs' Exhibit 54, reproduced in the appendix to this opinion.

**34.** See Plaintiffs' Exhibit 55, reproduced in the appendix to this opinion.

race. *See Lee supra.* We must therefore examine the evidence presented with regard to the principalships filled through promotion between August 30, 1975 and the date of trial.

Between August 30, 1975 and the date of trial the defendants filled through promotion eleven principalships. Three of those principalships were filled with black teachers and for obvious reasons the plaintiffs do not feel those promotions were improperly influenced by race. A black teacher was also selected to be principal of Central Elementary School but as will be discussed more fully below, that decision is being challenged by the plaintiffs.

For all but two of the principalships filled during this period, there were both white and black applicants. No blacks applied for the Lake Arthur principalship in 1979, even though the position was advertised. There were no applicants for the Northside Junior High principalship. That position was awarded to Johnnie Adams without any applications having been taken. That promotion is also not being challenged.

The plaintiffs do challenge the seven promotions where a white teacher was named principal of a school and there were both black and white applicants for the job.[35] Although each challenged promotion will be examined separately, as we examined the supervisory promotions, we find that when viewed as a whole the evidence reveals that the defendants followed a practice of naming as the principal of a school, a teacher or an assistant principal working at that school.[36] In each case where that practice was followed, the defendants offered as a reason for their decision the familiarity which the teacher or assistant principal had with the students, faculty, parents and community of the school. Since that reason was central to the explanations offered by the defendants for so many of their challenged decisions, we feel that our examination of the facts surrounding each promotion can be expedited if, at this point, we determine whether or not experience at a school constitutes a legitimate non-racial basis for a school board's selection of a teacher with such experience to be the principal of that school. We feel that it does.

Our conclusion is based upon the public nature of the principal's job. Because a principal of a school located in a small rural community is a conspicuous public servant, his prospects for success will depend if not entirely at least in large part upon whether he has the confidence of the public he serves.[37] While such confidence may be gained through demonstrated competence, it is essential that the principal be accepted by the community. As a result, in selecting a person to be a principal, a school board need consider not only whether a given applicant can assume the responsibilities of the job, but also, whether he is likely to be accepted by those who he will serve and with whom he will work.

In making this latter determination a school board can find no guarantees in the fact that an applicant has the degrees and certificates required for the job. When a professional position is being filled, many if

---

**35.** The principalships are those which were filled at: Lacassine High School, Ward Elementary School, Jennings High School, Lake Arthur Elementary, Welsh Roanoke Junior High School, Fenton High School, and Central Elementary School. The defendants advertised each position by sending to each school in the parish a notice announcing the vacancy in question, the qualifications required for the job and the deadline for when applications had to be submitted to Louis Gaudet.

**36.** The evidence showed that Johnnie Adams, the prominent plaintiff in this case, was a beneficiary of the School Board's preference for teachers with experience at the school where a principalship was available. He was named

acting principal at Northside Junior High School in 1979. He had been serving as the assistant principal at that school since the 1970–71 school year. We trust that he was named acting principal rather than just principal, because of uncertainty on the part of the defendants about whether they might have to assign Adams to another school as a result of this suit.

**37.** All the communities where the schools at issue are located are quite small. The total population of Jefferson Davis Parish is 31,600 people. Jennings is the largest city in the parish with a population of 11,700.

not all of the applicants will possess the required degrees or certificates. Such things do not tell an employer how well an applicant is likely to fit into a given work environment. To gain an insight on that question, an employer must evaluate an applicant on the basis of subjective factors such as the applicant's "knowledge of his subject, philosophy of life and education in general, appearance, references, leadership and aggressiveness." *Hereford, supra,* at 270. To school boards selecting principals, these considerations are no less important than they are to law firms or judges selecting associates and law clerks. We read *Hereford* as a recognition of that fact.

The rationale underlying the *Hereford* Court's approval of subjective factors being taken into account would seem to support a school board's giving decisive weight to the fact that an applicant for a principalship is presently employed at the school where the job is being offered. An applicant with such experience would presumptively share or at least be aware of and sensitive to community philosophies and attitudes on education, life, appearances etc. He also knows and is known by those who he will serve and with whom he will work. Since a person with such experience has probably already been accepted by those involved with the school, the likelihood that he will be accepted as the school's principal would seem to be greater than would be the case with someone without such experience.[38] Because of that, we feel that, unless the school board has reason to conclude otherwise, experience at a school where a principalship is being offered is a legitimate reason for the school board to conclude that an applicant with such experience is more likely to be accepted by the people involved with the school and therefore more likely to be a successful principal than an applicant without such experience.[39]

Experience at a school also provides a school board with some assurance that a teacher or an assistant principal with such experience will be able to assume the responsibilities of being the principal of that school. A teacher and particularly an as-

---

**38.** This conclusion finds support in the *Hereford* Court's approval of the reasons offered by the defendants in that case for why they chose a white teacher named Reichert instead of a black teacher named Robinson for a job there at issue. The court described Robinson's claim as follows:

> Mr. William Robinson has been the band director at Ed White Middle School for the past six years. He applied for the band directorship at Johnson High School when the high school first opened in 1972, but he was not appointed. This was the only vacancy in a band directorship since adoption of the unitary plan in 1971, and there were many applicants. The person appointed, Mr. Arnold Reichert, was the band director at Davis Hills (grades 1–9) and he had seven years experience. The Superintendent testified that Reichert was appointed because the students from Davis Hills would attend Johnson High School whereas the students from Ed White Middle School would attend another high school. Therefore, the music education of the students from Davis Hills would be less disrupted by Reichert's appointment than by Robinson's appointment."

*Hereford, supra* at 272.

**39.** We view our finding in this regard as being entirely consistent with the *Burdine* requirement that the reasons offered by the defendants "be clear and reasonably specific." *Id.*

—— U.S. at ——, 101 S.Ct. at 1096 (citation omitted). From reading *Burdine* it would appear that one means of evaluating the clarity and specificity of a defendant's proffered explanation would be to determine whether evidence which could demonstrate that the explanation was a mere pretext for discrimination would be readily available to the plaintiffs through discovery or access to EEOC investigative files. *See, Id.* at ——, 101 S.Ct. at 1096. When a teacher's experience at a school is offered as the reason for his selection as the school's principal, such evidence would be available in the school's personnel files. Letters from parents complaining about the teacher or other records revealing poor evaluations of or disciplinary problems with the teacher would probably show up in those files. Such things would suggest rather convincingly that the teacher's experience at the school did not provide a reasonable basis for believing that he would be accepted as the school's principal. Since plaintiffs have access to a defendant's personnel files through discovery, and since such files would provide a ready means of demonstrating the pretext of any decision allegedly based on a teacher's experience at a school, we feel that defendants who offer such experience as a reason for their decision have articulated a clear and reasonably specific explanation for their actions.

sistant principal with such experience has had an opportunity to observe first hand how the school is being run. He should thus not only have some knowledge as to how to manage the school but he will probably also have some ideas as to how the school can be better managed. As a result, we feel that experience at a school is a legitimate reason for a school board to conclude that a teacher with such experience will be more able to assume the responsibilities of the job than another teacher without such experience.

The type of experience we are discussing can be considered a non-racial factor in this case because no evidence has been offered suggesting that black teachers in Jefferson Davis Parish have been discriminatorily denied such experience. Indeed, the evidence in this case is to the contrary. At each school in the parish about 25% of the teachers employed and thus 25% of all teachers with present experience at a given school were black. There was no contention made by the plaintiffs that the number of black teachers employed at each school was less than that which would be expected in the absence of any racial discrimination on the part of the defendants. We accordingly find that experience at the school where a principalship is being offered was in this case not only a legitimate reason upon which the defendants could base their decisions but also a non-racial one.

Turning now to the evidence presented with regard to the principalships at issue in this case, we will continue to examine the reasons offered by the defendants for their decisions when the evidence reveals that the person selected and one or more black applicants for the job were authorized to be employed as a principal.[40] In those cases, when the reasons offered by the defendants include the experience of the person selected at the school in question, our conclusion that such experience is a legitimate non-racial basis for an employment decision will permit us to limit our review of the evidence to the determination of whether or not the defendants' decision was based on the reasons claimed. In those cases where the reasons offered do not include the person's experience at the school in question, we will consider the reasons offered in the same fashion that we did those offered in connection with the supervisory promotions.

### 1. Lacassine High School

■ During the summer prior to the 1976–77 school year, the Jefferson Davis Parish School Board, upon the recommendation of Louis F. Gaudet, Superintendent of Schools, selected Ms. Margaret Guilbeau to be principal of Lacassine High School.[41] Ms. Guilbeau was authorized to be employed as a principal.[42] One of the black applicants, Margaret Oscar, was not so au-

---

**40.** To be authorized to be employed as a principal, standards developed by the Louisiana Department of Education require that:

> "The applicant for school principalship must hold at least a valid Type B Louisiana Teaching certificate and a master's degree from a regionally accredited institution including 12 semester hours of professional education at the graduate level.
>
> He must have had 3 years of successful teaching experience during the 5-year period immediately preceding appointment to principalship. For high school principalship he must have had graduate training in secondary school administration and supervision; for elementary school principalship, he must have had graduate training in elementary school administration and elementary school supervision; for combination elementary-secondary school principalship, he must have had school administration and supervision training at either or both levels."

La. Dept. of Education Bulletin 746, *supra* at 40.

**41.** The board received six applications for the job. Three of the applicants, Margaret Guilbeau, Richard Sockrider and Clifford Freidman, were white. The other three applicants, Johnnie Adams, Margaret Oscar, and Arthur Lewis were black. Louis Gaudet reviewed all the applications but did not interview any of the applicants.

**42.** The plaintiffs have contended that Ms. Guilbeau was not authorized to be employed as a principal at the time she was selected. Her teacher's certificate (Defendants Exhibit 10) tells a different story. She received an endorsement on that certificate authorizing her to be employed as a principal on July 22, 1976. She was selected as principal sometime in August, 1976.

thorized and as a result we may conclude that her rejection was not based upon her race or sex. The two other blacks who applied for the job, Johnnie Adams and Arthur Lewis, were both authorized to be employed as a principal. We must therefore consider the reasons offered by the defendants for their selection of Ms. Guilbeau.

Superintendent Gaudet testified that Ms. Guilbeau was selected because of her experience in Lacassine. The evidence showed that not only was Ms. Guilbeau a native of Lacassine, and like its residents spoke French fluently, she had also taught at the school for several years and had served briefly as its acting principal during the school year prior to her permanent appointment.

For reasons we have already given, we feel that experience at the school where a principalship is being offered is a legitimate non-discriminatory reason for selecting a person with such experience as the school's principal. The evidence in this case shows that Ms. Guilbeau was the only applicant for the job with experience at the school. That she was chosen for that reason may be inferred from the fact that other applicants with greater administrative experience but without any experience at Lacassine were rejected.[43] We therefore find that the defendants rebutted plaintiffs' prima facie case with evidence which permits us rationally to conclude that their decision to hire Ms. Guilbeau was based on legitimate non-racial reasons and was not motivated by discriminatory animus.

The plaintiffs offered no evidence suggesting that the reasons offered by the defendants were a mere pretext for discrimination. We therefore find that the plaintiffs, Margaret Oscar, Johnnie Adams and Arthur Lewis, failed to prove by a preponderance of the evidence that they were denied the job of principal of Lacassine High School because of their race.

### 2. Ward Elementary

During the summer prior to the 1976–77 school year, the Jefferson Davis Parish School Board, upon the recommendation of Louis Gaudet, selected Mr. Robert Vincent to be the principal of Ward Elementary School.[44] Mr. Vincent was authorized to be so employed. Johnnie Adams, the only black applicant for the job, was also authorized to be a principal so we must consider the reasons offered by the defendants for their selection of Vincent.

Gaudet testified that Vincent was chosen because of his experience at Ward Elementary. That experience was deemed particularly important because of the school's history. The evidence showed that Ward Elementary had been operated as an all black elementary school until it was closed after this court's 1970 desegregation order. When it was later scheduled to be reopened, many of the parents whose children were to attend the school were apprehensive about sending their children to an integrated facility. There was concern in the community that those apprehensions would translate into trouble at the school. Virgil Perrin, who was named principal of the school, is given credit for having defused that tension through the use of several innovative techniques designed to promote communication among the parents and thus reduce their concerns.

The evidence showed that Robert Vincent had served under Perrin as a teacher from

---

**43.** Johnnie Adams and Richard Sockrider each had more administrative experience than Guilbeau. Adams had been Assistant Principal at Northside Junior High since 1970–71. Sockrider had been assistant principal at Welsh-Roanoke Jr. High School since March of 1972. If administrative experience and being a white male were factors deemed more important by the School Board than experience at Lacassine, it would seem that Sockrider, the white applicant with the most administrative experience,

would have been chosen rather than Guilbeau. Since he was not chosen, we think it most likely that Guilbeau was chosen for the reasons claimed.

**44.** Seven teachers applied for the job. All but Johnnie Adams were white. The white applicants were, Robert Vincent, Richard Sockrider, Clifford Friedman, Lou Guidry, Avis Trahan, Jr. and Gene Alcock. Gaudet reviewed the applications but did not interview the applicants.

the time the school was reopened until he was chosen to fill the vacancy created in the principalship by Perrin's promotion to Supervisor of Child Welfare and Attendance. Because Vincent had worked with Perrin and thus had an opportunity to observe first hand the way in which Perrin preserved racial harmony at the school, the defendants felt that Vincent could be expected to carry on the Perrin tradition. Although Johnnie Adams taught at Ward when it was an all black school, the evidence showed that Vincent was the only applicant for the job who had experience at the school after it had been reopened.

We find that the reasons offered by the defendants for why Vincent's experience at Ward Elementary led them to perceive him as the candidate for the job who was most likely to facilitate the tranquil maintenance of the school as an integrated facility closely parallel those which underlie our conclusion that experience at a school is a legitimate non-racial reason for a school board to select a person with such experience to be the principal of that school. That the reasons offered by the defendants were in fact those which governed their decision may be inferred from the fact that other applicants with greater administrative experience but no experience at the reopened Ward were rejected.[45] We therefore find that the defendants rebutted plaintiff's prima facie case with evidence which permits us rationally to conclude that their decision to hire Robert Vincent as principal of Ward Elementary was based on legitimate non-racial reasons and was not motivated by discriminatory animus.

The plaintiffs offered no evidence suggesting that the reasons offered by the defendants were a mere pretext for discrimination. We therefore find that the plaintiff, Johnnie Adams, failed to prove by a preponderance of the evidence that he was denied the job of principal of Ward Elementary School because of his race.

3. Jennings High School, Lake Arthur Elementary, and Welsh-Roanoke Junior High School

 Between August 1975 and the date of trial, the Jefferson Davis Parish School Board, upon the recommendation of Louis Gaudet,[46] selected the following white individuals to be the principal of the school appearing next to their names:

1. Paul DeLaCroix—Jennings High School (1976)[47]

2. Thomas Hymel—Lake Arthur Elementary (1976)[48]

3. Richard Sockrider—Welsh-Roanoke Jr. High, (1978)[49]

Each of these people was authorized to be employed as a principal. Johnnie Adams, the only black who applied for each position, was also authorized to be so employed. We must therefore consider the reasons offered by the defendants for their decisions.

Superintendent Gaudet testified that his decision in each instance was based upon the fact that the person chosen had experience at the school or in the community where the principalship was being offered. As we have already indicated, such experience would be a legitimate non-racial rea-

---

**45.** Having each served as an assistant principal, Richard Sockrider, Johnnie Adams, Avis Trahan and Gene Alcock, all had greater administrative experience than Vincent. Since the defendants rejected white applicants who had no experience at Ward, but who had administrative experience comparable to Adams and greater than Vincent, it seems probable that Vincent's experience at Ward was the basis of his selection over Adams and that race was not a factor.

**46.** Mr. Gaudet reviewed all the applications for each position and made his recommendation without interviewing the candidates.

**47.** There were four applicants for the position. All but Adams were white. The white applicants were Paul DeLaCroix, Eugene Van Hook, and Clifford Friedman.

**48.** There were six teachers who applied for the job. All but Adams were white. The white applicants were Thomas Hymel, Lou Guidry, Clifford Friedman, Richard Sockrider and Roy LaPoint.

**49.** There were six teachers who applied for the job. All but Adams were white. The white applicants were Richard Sockrider, Raymond Brown, Clifford Friedman, Sidney Soileau and Robert Dougherty.

son upon which to base the decisions at issue provided that the evidence presented permits us to conclude that the decisions were based on that reason. The evidence reveals that at the time they were chosen, DeLaCroix and Sockrider were employed as the assistant principal of the school where they became the principal. DeLaCroix had been the assistant principal at Jennings High School for five years and Sockrider at Welsh-Roanoke Junior High for seven years. Hymel had been the assistant principal at Lake Arthur High School for two years. The evidence also showed that Johnnie Adams did not have experience at any of these schools and that for each position the person chosen was the only applicant who did have administrative experience at the school or in the community where the position was available.[50]

In evaluating the evidence we find it difficult if not impossible to conclude that DeLaCroix, Hymel and Sockrider were chosen over Adams for any reason other than the administrative experience they had gained as assistant principals at the schools and in the communities where the jobs were being offered. We therefore find that with regard to the principalships at Jennings High School, Lake Arthur Elementary and Welsh-Roanoke Junior High, the defendants rebutted plaintiff's prima facie case with evidence which permits us rationally to conclude that their decisions were based on legitimate non-racial reasons and were not motivated by discriminatory animus.

The plaintiffs offered no evidence suggesting that the reasons offered by the defendants were a mere pretext for discrimination. We therefore find that the plaintiff, Johnnie Adams, failed to prove by a preponderance of the evidence that he was denied the job of principal of Jennings High School, Lake Arthur Elementary and Welsh-Roanoke Jr. High because of his race.

### 4. Fenton High School

During the summer prior to the 1978–79 school year, the Jefferson Davis Parish School Board announced an opening in the principalship at Fenton High School. The board received six applications for the job.[51] After each candidate was interviewed Mr. Louis Gaudet recommended Gene Alcock for the position. Alcock was authorized to be employed as a principal and was selected by the school board. Since Johnnie Adams, the only black applicant, was also authorized to be so employed, we must consider the reasons offered by the defendants for their selection of Alcock.

The selection of Alcock was a deviation from the defendants' apparent practice of promoting an individual with experience at the school where the job was being offered. At the time he was chosen Alcock was the assistant principal at Welsh High School. Superintendent Gaudet testified that because of school related political strife in Fenton he felt that someone without significant contacts with the community was needed to restore political tranquility. He viewed Alcock as the man for the job.

The evidence revealed that at the time the school board was considering the applicants for the Fenton principalship, the com-

---

**50.** Although Hymel had no experience at Lake Arthur Elementary, his experience at Lake Arthur High School and in the community was such that the defendants viewed him as the applicant for the job who was most likely to be accepted as the school's principal. Hymel was a native of Lake Arthur who had taught at its High School for twenty years. Presumably he was well entrenched in the community. Unlike the typical high school which is composed of grades 9–12 Lake Arthur High School consists of grades 6–12. Thus as assistant principal of that school, Hymel had administrative experience at a school attended by children who would normally be found in a school such as Lake Arthur Elementary. When viewed as a

whole those facts led the defendants to perceive Hymel as the next best thing to an applicant with administrative experience at the Lake Arthur Elementary School. There was no applicant with such experience although Lou Guidry was a teacher at Lake Arthur Elementary. Hymel's selection over Guidry suggests that Hymel's administrative experience in the community was the reason for his selection.

**51.** All of the applicants except Adams were white. The white applicants for the position were Gene Alcock, Richard G. Carpenter, Eugene Van Hook, Raymond Brown and Alton Bass.

munity was deeply divided over a local school board election. The divisions in the community were reflected in the school itself and among the candidates for the principalship. Alton Bass, the school's long time assistant principal and an applicant for the principalship, was apparently actively involved with one of Fenton's feuding political factions. Johnnie Adams admitted that he too had taken an active role in the conflict though he denied that his involvement was widely known in the community.[52] The evidence also showed that Alcock was opposed by one of the groups in Fenton but no evidence was introduced suggesting that he had taken an active role in the town's squabble.

In examining the evidence presented in connection with the Fenton principalship, we must first consider whether the reasons offered by the defendants for their selection of Alcock can be considered legitimate and non-racial. In that regard we feel that non-racial factors which are relevant to a job being filled constitute legitimate non-racial reasons upon which an employer may base his selection of an applicant who is otherwise qualified for the job. There is no dispute in this case that Alcock was qualified for the job. Nor is there any contention that race was in any way an issue in the school related politics which divided Fenton at the time this decision was made. So, our inquiry is limited to the question of whether the extent to which an applicant participated in those politics was a factor relevant to the Fenton principalship and thus a legitimate factor upon which the defendants could base their decision. We think that it was.

As mentioned earlier, when the job at issue is the principalship of a school, a relevant consideration for the school board is the likelihood that an applicant for the job can gain the confidence of the community in which the school is located. When that school is located in a community as deeply divided over school-related politics as Fenton was at the time when the decision here at issue was made, a factor relevant to an applicant's ability to gain the confidence of that community would be the extent, if any, to which he participated in those politics. An applicant who had actively involved himself in the political strife of the community could not be expected to readily gain the confidence of at least those members of the community who did not share his political point of view. An applicant who had not been so involved would not have that problem. For that reason we feel that the extent to which an applicant for the Fenton High School principalship participated in the politics of that community was a legitimate non-racial reason upon which the defendants could base their decision. We must now determine whether the evidence presented permits us to conclude that the defendants' decision was based on the reasons claimed.

The evidence showed that at least two applicants for the Fenton principalship, Alton Bass and Johnnie Adams, were actively involved in the politics which had divided the town. No evidence was introduced showing that Alcock was similarly involved although there was some indication that his selection as the school's principal was opposed by one of Fenton's factions. However, given the fact that other applicants for the job were so involved in the political intrigue of Fenton, it is not surprising that Alcock's selection was opposed and we thus need not be prevented thereby from finding that he was chosen for the reasons claimed. For that determination the more telling fact is that Alcock was chosen instead of Alton Bass.

Bass had been the assistant principal at Fenton High School for nine years, yet when the time came to choose a principal he was passed over in favor of Alcock, an assistant principal from another High School. When viewed in light of the defendants' practice of naming as principal of a school a person with experience at that

52. We found Adams to be generally evasive on the witness stand and particularly so on this point. In a town the size of Fenton (pop. 435)

we doubt very much whether Adams could have kept his involvement a secret even had he tried. We do not believe he did.

school, that fact raises the inference that the defendants' decision was influenced by Fenton's political turmoil and Bass' role in it. That inference permits us to conclude that Adams, who had no experience in Fenton, was denied the job for the same reasons and not because of his race. We therefore find that the defendants rebutted plaintiffs' prima facie case with evidence permitting us rationally to conclude that their decision to appoint Gene Alcock as the principal of Fenton High School was based on legitimate non-racial reasons and was not motivated by discriminatory animus.

The plaintiffs offered no evidence suggesting that the reasons offered by the defendants were a mere pretext for discrimination. We therefore find that the plaintiff, Johnnie Adams, failed to prove by a preponderance of the evidence that he was denied the job of principal of Fenton High School because of his race.

### 5. Central Elementary

 During the summer prior to the 1977–78 school year, the defendants chose a principal for the Central Elementary School. Although the defendants had solicited and received several applications for the position,[53] the person they ultimately chose, Wilbert Guilbeau, had not applied for the job. The method by which the defendants chose Guilbeau is confusing at best.

In selecting the principal for Central Elementary, the defendants initially employed a procedure which had been developed in response to complaints made by the plaintiffs about the defendants' promotion practices. This procedure involved a scoring system whereby a panel of four supervisors would give an applicant a specified number of points for academic achievements, work experience, civic leadership activities, etc. The panel also interviewed each applicant and then each member of the panel would score the applicant's performance during that interview on a scale of 1–100. After the interview, the scores given to each applicant by the panel members were to be tallied and compared against one another with the job going to the applicant with the highest score.

Had the defendants followed that procedure, Mr. Gene Alcock would have received the job, but he did not. The reason for that would seem to be that the white members of the panel had given Adams very low scores on his interview.[54] Out of apparent fear that those scores would provide the basis for another claim by Adams that he had been denied a job because of his race, the defendants rejected the results of the procedure, announced that they were abandoning the procedure altogether because certain components of it were too vague[55] and then, in an effort to dispel the looming inference that Adams had been denied the job because of his race, they offered the job to Guilbeau who was not then authorized to be employed as a principal, but who was black.

Because the defendants did ultimately choose a black teacher to be the principal of Central Elementary School, the plaintiffs do not vigorously contend that Adams was denied the job because of his race. To the extent that they do make that contention we feel it is without merit.

 Although the method by which Guilbeau was made principal does raise some question about what motivated the defendants to give Adams such low scores on his

---

**53.** The School Board received seven applications for the job. Those who applied were A. L. Trahan, Jr., Clifford Friedman, Gene Alcock, Roberta Doucet, Johnnie Adams, Richard Sockrider and Roy LaPoint. All except Adams were white.

**54.** The members of the panel were Louis Gaudet, Superintendent of Schools, Allen Fitzgerald, Assistant Superintendent, Freddie Whitford, Supervisor of Elementary Education, and Wilbert Rochelle, Supervisor of Special Educa-

tion. All except Rochelle were white. For the scores given to Adams by the panel members see Plaintiffs' Exhibit 12.

**55.** The vagueness of the components is reflected in the difference between the points given by each interviewer for the various experience categories. For example, Plaintiffs' Exhibit 12 shows that Wilbert Rochelle gave Adams 35 points for his years as an Assistant Principal whereas Gaudet gave him 50 points.

interview, the fact that Guilbeau is black negates to a large extent an inference that Adams received those scores because of his race. We feel the evidence suggests that the more likely reason for those scores was that those who interviewed Adams had grown weary of his confrontational approach to securing a principalship.

Plaintiffs apparently reached a similar though distinct conclusion after hearing the defendants' testimony because for the first time during this litigation they somewhat vigorously assert in their post-trial brief that Adams received the low scores on his interview in retaliation for his having filed complaints with the EEOC and this court. Such retaliation if proven would be violative of 42 U.S.C. § 2000e–3(a).[56] Although there is some question about whether a claim of retaliation may be asserted at trial without having first been presented to the EEOC,[57] and no doubt, a more serious question about whether such a claim may be raised for the first time after trial, we will nonetheless consider whether the allegation is supported by the evidence presented.

In support of his claim Adams points to the interview sheet of Louis Gaudet which contains Gaudet's comment that Adams was "too controversial" and not acceptable to the school board because of his "actions."[58] The plaintiffs clearly want us to conclude that the "actions" referred to by Gaudet were the various complaints Adams lodged against the school board with the EEOC and with this court. Were we to find that by "actions" Gaudet was referring to this suit and Adams' EEOC complaint, we would be inclined to find that Adams received the low scores in retaliation for his assertion of rights protected by Title VII.

However, Adams was reviewed by three people other than Mr. Gaudet. Two of those interviewers did not mention Adams' "actions" but did note that Adams was rather preoccupied with his belief that he had been a victim of racial discrimination and that he was hostile towards the school board for that reason.[59] Mr. Gaudet made

---

**56.** 42 U.S.C. § 2000e–3(a) reads as follows:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor management committee controlling apprenticeship or other training or retraining, including on the job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**57.** There is a divergence of opinion as to whether the Title VII plaintiff must present a retaliation claim to the EEOC in order to be able to include such an allegation in his complaint. Some courts have refused to entertain claims of retaliation when such claims have not first been presented to the EEOC, reasoning that a charge of retaliation is different in kind from other Title VII violations. *See* e. g., *Jiron v. Sperry Rand Corp.*, 423 F.Supp. 155, 162 (D.Utah 1975); *Eastwood v. Victor Temporaries*, 441 F.Supp. 51, 53 (N.D.Ga.1977). Others have held that prior resort to the EEOC is not a prerequisite to including an allegation of retaliation in the civil suit. *Bernstein v. National Liberty International Corp.*, 407 F.Supp. 709,

713 (E.D.Pa.1976); *Held v. Missouri Pacific Railroad Company*, 373 F.Supp. 996, 1002 (S.D. Tex.1974); *Flesch v. Eastern Pa. Psychiatric Institute*, 434 F.Supp. 963, 970 (E.D.Pa.1977). The rationale of these latter cases is twofold: (1) retaliation is the kind of Title VII violation which "can reasonably be expected to grow out of the charge of discrimination," *Sanchez v. Standard Brands*, 431 F.2d 455, 466 (5th Cir. 1970); and (2) there is a strong policy justification in deterring an employer from attempting to discourage an employee from exercising his or her rights under the Civil Rights Act. Additionally, since it is the nature of retaliation claims that they arise after the filing of the EEOC charge, requiring prior resort to the EEOC would mean that in every case where retaliation is an issue the employee would have to file a second charge with the EEOC, thereby erecting another procedural barrier to a Title VII suit.

**58.** See Plaintiffs' Exhibit 12.

**59.** Mr. Allen Fitzgerald noted on his interview sheet that Adams was "evasive on most *all* questions, attitude very poor, argumentative." (emphasis in original). Mr. W. F. Whitford noted that Adams was "somewhat oversold on himself and his ability. Too much time devoted to issues and opinions relating to things other than education and administration. Mr. Adams expressed himself very strongly about

similar observations of the interview.[60] The only interviewer not noting Adams' complaints during the interview was Wilbert Rochelle, a plaintiff in this case. Defendants would have us conclude that it was because of the negative attitude which Adams displayed toward the school board during the interview that he did not receive higher scores. The conflicting contentions urged upon us by the parties require us to examine the scope of the protection afforded to an employee by Section 2000e–3(a) in order to determine whether Adams' conduct during the interview was protected by that provision.

While Section 2000e–3(a) protects an employee opposing what he considers to be discriminatory acts or practices of the employer, not every method of opposition is protected. Congress intended the employee to be protected from employer reprisals whenever his opposition was expressed in an orderly fashion through accepted channels. Opposition manifesting itself in unlawful conduct has been held by the Supreme Court to be a sufficient non-discriminatory basis for terminating an employee. *See McDonnell Douglas Corp. v. Green, supra.* On the other hand, opposition channeled through the EEOC and the courts is protected as are investigative efforts made in conjunction with such opposition. Between these extremes there is a range of opposition which may or may not be protected. Within this range, a court deciding whether employee conduct is protected opposition "must balance the setting in which the activity arises and the interests and motivations of both employer and employee." *Hochstadt v. Worcester Foundation etc.*, 545 F.2d 222, 232 (1st Cir. 1976). The *Hochstadt* court further noted that occasions existed "when the employer was entitled to expect [an employee's] full commitment and loyalty. Section 2000e–3(a) does not afford an employee unlimited license to complain at all times and places. . . .

. . . .

[T]he employer's right to run his business must be balanced against the rights of the employee to express his grievances and promote his own welfare." *Id.* at 233.

The plaintiff in *Hochstadt* felt she had been discriminated against on the basis of her sex. She had lodged a complaint with the appropriate authorities. Thereafter she complained regularly and bitterly to her supervisor and colleagues about the poor treatment she felt she had received. Her complaining became a disruptive influence where she worked. The lack of harmony among the staff which her complaints engendered began having adverse effects upon the objectives of the business. She was ultimately fired for that reason.

In our case little about Johnnie Adams' activities is known other than that he filed suit and complained about his treatment during the Central Elementary interview. His action in filing suit is, of course, protected. His complaints during the interview fall within that range of employee conduct which may or may not be protected. Since his complaints were noted by three interviewers as at least one if not the primary reason for the low scores they gave him, we must determine whether those complaints were protected "opposition" under 42 U.S.C. § 2000e–3(a).

We feel that Adams' complaints during the interview were not a form of opposition protected by Section 2000e–3(a). An interview for a job, perhaps more than any other employment setting, is an occasion when an employer is "entitled to expect [an employee's] full commitment and loyalty." *Hochstadt, supra* at 233. An employee's expression of ill-feelings toward his employer during an interview can hardly be considered an omen that a harmonious work relationship would ensue if he were given the job. But beyond that, an interview is a time when the interests of the employer are preeminent. It is not the time for com-

---

being passed over for promotions because of his race." See Plaintiffs' Exhibit 12.

60. Gaudet noted that Adams "does not have confidence in the school board. Believes board is bias [sic] . . . Believes strongly that he was discriminated against." Plaintiffs' Exhibit 12.

plaints. This is especially true when the complaining employee has taken advantage of grievance procedures available to him. At the time of the interview Adams had taken advantage of the ultimate grievance procedure; he had filed suit in this court. Because of that, his comments during the interview should have been confined to the school board's purpose for the interview, i. e. filling the principalship at Central Elementary.[61] For the foregoing reasons we do not believe that Adams' complaints during the interview were protected by Section 2000e-3(a). What remains, however, is to determine whether Adams' failure to receive the promotion was based upon his unprotected complaints or the fact that he took the protected action of filing suit.

We feel that Adams' complaints during the interview were sufficient by themselves to justify his rejection. Three of the four interviewers noted the complaints as a reason for the low score given to Adams. Of those three, only Gaudet made reference to Adams' "actions" making him unacceptable to the school board. By using the word "actions" we do not know whether Gaudet was referring to this suit or to some extraneous activities in which Adams may have participated.[62] In contrast to the ambiguity attending Gaudet's use of the word "actions" is the rather clear description given by Whitford, Fitzgerald, and Gaudet of the

negative attitude towards the school board which Adams displayed during the interview. Those descriptions plus the testimony at trial concerning the interview [63] demonstrate to our satisfaction that Adams was denied the job because of his conduct during the interview and not because he filed suit. We accordingly hold that Section 2000e-3(a) was not violated when Adams was denied the Central Elementary principalship.

## C. COACHES

■ Plaintiffs claim that they were denied numerous coaching positions because of their race. To establish a prima facie case plaintiffs offered statistics showing that between the time of desegregation and the filing of this suit, eighteen of the nineteen teachers who were made head coaches were white and only one was black.[64] The statistics also showed that immediately prior to when this suit was filed, seventeen of the eighteen head coaches in the parish were white and one was black.[65] A similar pattern was shown with respect to assistant coaches. Twenty-four of the twenty-six assistant coaches chosen between 1970 and August 1976 were white and two were black.[66] As for the assistant coaches in place immediately prior to suit being filed, the statistics showed that nineteen of the

---

**61.** Adams and Rochelle both testified that Adams did not volunteer his attitudes about the School Board but instead provided them in response to questions on the subject posed by the white interviewers. The evidence on the point is unclear. Although we suspect the credibility of Adams and to a certain degree Rochelle, we note that Fitzgerald did express an uncharacteristic uncertainty about whether he or another white panel member had asked Adams such a question. Assuming therefore, that the question was asked, we nonetheless feel that an interview was a time when Adams ought to have constrained himself more than he apparently did. The panel was entitled to inquire about whether Adams' feelings were such that it would be difficult for a good working relationship to develop between him and both the panel and the school board. By using a question directed at that issue as a springboard for a thorough criticism of his prospective employers Adams provided a rather clear answer. We would think that had he been genuinely inter-

ested in the job, Adams would have perceived the interview as a time dictating a more diplomatic response.

**62.** Although Adams was not involved in the politics of Fenton until a year after the Central Elementary job was filled, we suspect that that was not his first involvement in controversial school related politics. Public criticism of one's employer is never well received by the employer.

**63.** We found Whitford, Fitzgerald and Gaudet all more worthy of belief than Adams.

**64.** See Plaintiffs' Exhibit 54 reproduced in the appendix to this opinion.

**65.** See Plaintiffs' Exhibit 55 reproduced in the appendix to this opinion.

**66.** See Plaintiffs' Exhibit 54 reproduced in the appendix to this opinion.

twenty assistant coaches in the parish were white and one was black.[67] These statistics plus the school system's history of discrimination establish a prima facie case of racial discrimination requiring us to examine the evidence presented with regard to the claims made by individual plaintiffs that they were denied coaching positions between August 1975 and the date of trial because of their race. *See Lee v. Washington County School Bd., supra.*

Before considering the evidence presented in regard to those claims, we note that the qualifications for being a coach and the method by which coaches were chosen were entirely different from those used to fill the administrative positions. With regard to qualifications, the evidence showed that any certified teacher may be a coach. Regulations promulgated by the Louisiana Department of Education do not establish any criteria which must be satisfied before a teacher may receive an endorsement on his certificate authorizing him to be employed as a coach. No such endorsement exists. The only requirement is that the teacher be certified.

Although the State of Louisiana has established no prerequisites for becoming a coach other than that the teacher must be certified, the Jefferson Davis School Board requires coaches to teach class room subjects. This means that before an applicant for a coaching position may be hired, the school where the coaching position is available must also have a need for a classroom teacher. Assuming that such is the case, then to be hired, the applicant for the coaching position must be authorized to teach the classroom subject for which the school has need of a teacher.

Because of the requirement that a coach must also teach a classroom subject, it is possible that a vacancy could occur in the coaching staff which could not be filled through the hiring of a new teacher. This would occur when a teacher who has been serving as a coach decides that he no longer wants to coach but remains on the school's teaching staff. In such a situation, if no other teachers leave the faculty, the coaching slot would have to be filled by another teacher at the school.

Perhaps as a result of the frequency with which that situation developed, the method by which coaches were selected in Jefferson Davis Parish was different from the way in which principals were chosen. The evidence showed that until 1979, the school board did not advertise coaching positions [68] and as a result coaches were not chosen from a number of applicants for a given position.[69] Although the school board formally hired coaches, the task of recruiting a coach was left primarily to the principal of the school where the position was available. His recruitment efforts would vary dependent upon whether a teacher could be hired. If vacancies in a school's coaching and teaching staffs permitted the principal the luxury of hiring a new teacher, he could fill the coaching slot in either of two ways: (1) he could choose as the coach a member of his faculty who had expressed interest in coaching and then fill the teaching position with a new hire; or (2) in the event that no faculty member wanted to coach, he could recruit a new teacher to fill both the teaching and coaching positions.[70] If the school

**67.** See Plaintiffs' Exhibit 55 reproduced in the appendix to this opinion.

**68.** Louis Gaudet testified that since the Parish has been advertising coaching positions, no blacks have applied.

**69.** The school was always receiving unsolicited applications for coaching positions but they would not be directed towards a specific position at a specific school as was the case with applications for principalships. For many of the positions which were filled between August 1975 and the date of trial, Allen Fitzgerald

testified that blacks who had applied at the times when those positions were open were either not authorized to teach the classroom subjects for which the school had need of a teacher or had not expressed an interest in coaching on their application.

**70.** The evidence showed that representatives of either the Jefferson Davis Parish School Board or individual schools in the parish would be sent to predominantly black universities in Louisiana to recruit teachers and coaches. Since at least April of 1975, the Jefferson Davis School Board has sent a representative, either

needed a coach but had no vacancies in the teaching staff, the recruitment efforts of the principal would be confined to trying to convince members of his faculty that the thrills of athletic triumph were worth the agony of spending so many after school hours in practice and competition.[71] As for this last approach, the evidence showed that oftentimes the principal would become the coach.[72]

Because of the way in which the defendants selected coaches, the evidence presented by the parties does not allow us to determine plaintiffs' claims of purposeful discrimination through an examination and comparison of the qualifications of particular applicants for particular coaching positions. Instead our determination must be based upon the evidence presented in support of the claims of those plaintiffs who allege that they wanted to become coaches but could not do so because of racial discrimination. As a result we will examine the evidence on a plaintiff by plaintiff basis.

### 1. Jessie Allison

■ Plaintiff Jessie Allison claims that he was denied a coaching position because of his race. Allison is a black teacher at Elton High School who prior to desegregation had been a successful basketball coach at one of the black schools in Jefferson Davis Parish. He lost that position when the school at which he taught was closed as a result of integration. Although Allison did not request nor was he offered a coaching position when he came to teach at the Elton High School, he apparently wanted one.

So far as the evidence shows, the first time Allison communicated to the defendants his desire to be a coach was in a letter dated January 26, 1977, seven years after the schools had been desegregated but shortly after this suit was filed. In apparent response to his letter, the defendants offered Allison a position as assistant basketball, track and football coach at Elton. Although Allison had said in his letter that he was interested in a coaching position at either Jennings or Elton,[73] he rejected the defendants' offer in a letter dated July 13, 1977, stating that: "in light of the fact that I have filed a lawsuit against the School Board and further in light of the fact that I have been passed over in the past for assistant coaching jobs to which I am entitled, I respectfully decline to accept this offer." [74]

Harry Levy or Wilbert D. Rochelle, to Grambling State University and Southern University, to recruit teachers and teachers who were also interested in coaching. See Defendants' Exhibits 66–73. Also, while principal at Jennings High School, J. E. Harelson and his assistant principal, who was black, James Ward, attempted to récruit black teachers who could serve as coaches and contacted Grambling State University and Southern University but never received an application or even a reply from any individual stating he was interested. The reason for that would seem to be that a parish the size of Jefferson Davis does not have a great allure for competent collegiates, who view employment in a larger area as both more exciting and lucrative.

71. Plaintiffs argued that since so many principals in Jefferson Davis Parish were white and since white principals allegedly only socialize with white teachers, black teachers interested in coaching positions would not discover that a coaching position was available until it was filled. We find that hard to believe. With schools as small as those in question and with the interest usually generated in sports at such schools, we seriously doubt whether a coach's eminent departure could very easily be kept a secret from the twenty-five percent of every school's faculty who were black. Rumors are the life blood of such schools and are somewhat hard to contain. But even if we assume that the defendants once managed to keep the impending availability of a coaching position a secret, we find it difficult to understand why the plaintiffs would not make it known to the defendants that they would be interested in the next available position. The evidence is clear that once the defendants knew of a plaintiff's interest they would offer jobs. It is unfortunate that the method chosen by the plaintiffs for communicating their interest was this suit.

72. That fact when paired with the rather high turnover rate in head and assistant coaching positions between 1970 and 1976 (see Plaintiffs' Exhibits 54 and 55 in appendix) suggests to us that contrary to what plaintiffs contend, coaching is more drudgery than glamour.

73. See Plaintiffs' Exhibit 24.

74. See Defendants' Exhibit 19.

Except for annual faculty questionnaires in which Allison gave no clear indication of a desire to be a coach,[75] there is no evidence in the record that Allison and the defendants communicated directly about a coaching position from the time of Allison's July, 1977 letter until trial.

During Allison's trial testimony it became apparent that the only coaching position he had ever wanted was that of head boys basketball coach at Elton. The evidence revealed that from some time prior to August 30, 1975, through the 1979–80 school year, that position was occupied by Mr. Robbie Treme. When Treme left the post after the 1979–80 school year the defendants first offered the job to a white man from St. Louis named Larry Dell Johnson. Johnson had no experience as a coach.

It later developed that Mr. Johnson was unable to take the job. When the trial started the defendants had yet to find anyone to fill the position. During a last minute effort to settle this case, it was communicated to the defendants for the first time since Allison's July, 1977 letter that he still desired a coaching position. The defendants offered him the job and apparently agreed to pay him a coach's supplement retroactively to the beginning of the 1980–81 school year. Allison accepted the offer from the witness stand during the course of his testimony.

In evaluating Allison's claims of discrimination we can not help but note that he could not have been denied the job he wanted because of his race until a vacancy in that position occurred. The evidence shows that the first vacancy in that job, during the period relevant to his claim, occurred after he had rejected an offer of a coaching job in terms which would lead a reasonable employer to conclude that until this litigation terminated, Allison was not interested in any offers of a coaching position. The defendants never received from Allison any

comparably unequivocal indication to the contrary until trial and when they did, they offered him the job he apparently always wanted. Because of that, we have serious difficulty viewing as evidence raising an inference that Allison was denied the job because of his race, the fact that defendants first offered it to a white individual without any coaching experience. We therefore have doubts about whether Allison established a prima facie case of discrimination and, if he did, we hold that he failed to prove his claim by a preponderance of the evidence.

### 2. Harry Guilbeau

Harry Guilbeau is a black industrial arts teacher at Jennings High School and a class member in this suit. He claims that he was denied a coaching position because of his race. Like Allison, Guilbeau had been a successful basketball coach at a black high school prior to desegregation. He too lost his coaching position when the school where he worked was closed as a result of integration.

Although Guilbeau claims that he desired a coaching position between August 30, 1975 through sometime in 1978, when he says he lost interest, the evidence shows that he never communicated that desire to anybody within the Jefferson Davis Parish School system who was in a position to do anything about securing for him such a job. J. E. Harelson, the principal of Jennings High School when the school was integrated, testified that both he and his black assistant principal asked Guilbeau if he was interested in becoming a coach at the time he joined the Jennings High School faculty. Guilbeau advised Harelson that he did not desire a coaching position.

The only subject which Guilbeau is authorized to teach is industrial arts[76] and the only school in the parish where industrial arts is taught is Jennings High School. In

---

**75.** Each year on the faculty questionnaire teachers would be asked "if vacancies occur what changes, if any, would you like to make within the parish?" On his 1978 questionnaire, Allison answered this question by typing in "Head Basketball Coach at Elton High School."

See Defendants' Exhibit 21. On his 1979 questionnaire Allison answered the question by typing in "None." See Defendants' Exhibit 22.

**76.** See Defendants' Exhibit 27.

1976, at a time when Guilbeau had yet to communicate to the defendants any desire to be a head boys basketball coach, the defendants filled that position at Jennings High School with a black individual named Robert Allen. Thereafter Guilbeau was asked by Mr. Fitzgerald if he desired to be an assistant girls basketball coach at Jennings High.[77] In a letter dated February 25, 1977, Guilbeau rejected the offer stating that he was "unable to assume any additional responsibilities."[78]

When we view the evidence presented in connection with Harry Guilbeau's desire to become a coach, we simply find it impossible to conclude that he was denied such a position because of his race. As a consequence we hold that he failed to prove his claim by a preponderance of the evidence.

### 3. Dorothy Harris

Dorothy Harris is a black physical education teacher at Jennings High School and a class member in this suit. She claims that she was denied a girl's coaching position because of her race. The basis of her claim is that she was "available" for such a position but the defendants never asked her if she wanted one. Of course, she never told the defendants that she did.[79] That being the case, we are apparently being asked to decide whether the defendants' failure to realize that Harris had a secret desire to become a coach was racially motivated and if so whether Harris is entitled to relief.[80] Such a claim is, in a word, ludicrous. Title VII, 42 U.S.C. §§ 1981, 1983 and the Constitution do not require an employer to be clairvoyant.

Assuming, nonetheless, that Harris has asserted a legitimate claim, the record reflects that the defendants' failure to seek out Harris for a coaching position was more likely attributable to something other than her race. The evidence showed that Harris had a bit of an absenteeism problem. During one year, she missed work on eighteen days, eight of which were Mondays.[81] The rather curious frequency with which Ms. Harris was apparently afflicted on Mondays led to her being reprimanded by the superintendent for excessive and presumably inadequately explained absences.[82] She was also reprimanded for her failure to follow the school's rules about notifying the school when she was going to be absent.[83]

In light of that evidence we feel that if the failure of the defendants to realize that Ms. Harris wanted to be a coach can be a basis for her claim, it is apparent that their failure was not racially motivated. Through her many absences, Harris provided the defendants with more reason to question whether she could handle her teaching duties than to realize that she wanted the additional responsibilities of being a coach. We therefore hold that Harris failed to prove whatever claim she had by a preponderance of the evidence.

### D. LUNCHROOM MANAGERS

A lunchroom manager is basically the head cook in the school's cafeteria and is responsible for deciding the menus, ordering food, etc. The lunchroom manager is also responsible for any after school emergencies such as power outages which necessitate getting food out of freezers and for any after school or weekend use of the

---

77. See Defendants' Exhibit 30.

78. See Defendants' Exhibit 31.

79. Harris had been a coach at a black school prior to desegregation. She lost that job when her school was closed. Because of that she felt that the defendants ought to have assumed that she wanted to continue coaching.

80. So secret was Harris' desire to become a coach that she did not mention it on annual faculty questionnaires wherein teachers were specifically asked whether they would like to make any changes within the school system. See Defendants' Exhibits 23 and 24. While

plaintiffs claim that the question was phrased so ambiguously that plaintiffs did not realize that it concerned whether or not they desired a different job, Harris apparently understood the question because in the 1979–80 questionnaire she said she would like the same position only at another school. See Defendants' Exhibit 24.

81. See Defendants' Exhibit 25.

82. See Defendants' Exhibit 25.

83. See Defendants' Exhibits 25 and 26.

cafeteria by both school and nonschool organizations. For these latter reasons the defendants have traditionally hired as lunchroom managers people who live in the community where the school is located. The evidence showed that of all the lunchroom managers in Jefferson Davis Parish only one does not live in the community where her school is located.

To be a lunchroom manager a person must be certified by the state of Louisiana. A person may become certified through attending regularly scheduled workshops sponsored by the state. Although the plaintiffs claim that black lunchroom workers were not notified of when those workshops would be held, the claim finds no support in the record.

The plaintiffs claim that they were denied lunchroom manager positions because of their race. To support their claims they offered statistics showing that between 1970 and August 1976, one black individual became a lunchroom manager.[84] They did not offer any evidence concerning how many lunchroom manager's positions came open during that period of time nor did they offer evidence showing how many white individuals had been given positions which did come open. The plaintiffs also offered statistics showing that one of the thirteen lunchroom managers in place immediately prior to this suit being filed was black; the rest were white.[85]

Even when these statistics are considered in the context of the school system's history of discrimination, we cannot find that they establish a prima facie case of discrimination. "Discrimination in promotions is not proved by the absence of blacks in particular positions at particular schools." *Hereford, supra* at 273. Nor can a prima facie case be made out unless some evidence is presented suggesting that blacks were treated differently from similarly situated whites. No such inference may be drawn from plaintiffs' statistics. For all we know

from those statistics, a black may have received the only vacancy which occurred in a lunchroom manager's position between 1970 and 1976. We thus hold that those statistics did not establish a prima facie case of racial employment discrimination.

The only other evidence presented in connection with lunchroom managers was that presented in connection with the claim of Hilda Beloney. Hilda Beloney is black and is presently employed as the lunchroom manager of the Welsh-Roanoke School. Prior to desegregation she was the lunchroom manager at an all black school. When her school was closed in 1970 by desegregation, she was assigned to work as a lunchroom worker at Welsh. With lunchroom managers such as Beloney, who were displaced by desegregation, the defendants followed a policy of offering them the first opening in that position which occurred at the school where they were assigned after integration. This policy was followed when Ms. Beloney became the lunchroom manager at Welsh. The evidence also shows that from 1972 through the time she became lunchroom manager at Welsh, Ms. Beloney was paid the salary of a lunchroom manager although she was employed as a lunchroom worker.

Although Beloney admits that she never told anyone that she was interested in being the lunchroom manager at any school other than Welsh-Roanoke, she claims that because of her race she was not offered lunchroom manager positions which were available at Hathaway High School and Central Elementary in September, 1976. Both positions were awarded to properly certified white individuals who lived in the communities where those schools were located and who presumably expressed an interest in the jobs.

Beloney became a plaintiff in this suit in May, 1977, eight months after she was allegedly denied jobs because of her race and

---

84. See Plaintiffs' Exhibit 35, reproduced in the appendix to this opinion.

85. See Plaintiffs' Exhibit 55, reproduced in the appendix to this opinion.

nine months after this suit was originally filed. During the summer of 1978 the defendants offered Ms. Beloney the first lunchroom manager's position which came open in the parish since those which had been available at Hathaway and Central Elementary. The job was in Elton. Ms. Beloney declined the offer because she felt the 25 miles between her home and Elton was too long a distance to drive each day. The distance from her home to Hathaway and Central Elementary was nineteen and fifteen miles respectively.

The next time there were openings for lunchroom managers was in September of 1980. Three such vacancies occurred at that time with one being at the school where Beloney worked, Welsh-Roanoke. Ms. Beloney was offered and accepted that position. At that time, she was the only black individual in the parish who was certified to be a lunchroom manager. The other two jobs were awarded to certified white individuals.

In looking at this evidence we do not feel that Beloney has made out a claim of racial discrimination. Without having been informed to the contrary, the defendants had every reason to believe that their policies with regard to lunchroom managers were fair and non-discriminatory. The evidence showed that the responsibilities of being a lunchroom manager were such that the defendants could reasonably assume that the job would not be attractive to any one who had to drive a significant distance to get to the job. The reasonableness of that assumption is demonstrated by the fact that Beloney rejected the Elton position because it was twenty-five miles from where she lived. Because of the reasonableness of that assumption, the defendants had every reason to think that their policy of awarding to a demoted lunchroom manager the first opening in that position which occurred at the school where she worked, was a fair and non-discriminatory way to deal with the hardship suffered by those who were demoted as a result of integration.

Those facts, when viewed in light of the reasonable probability that the defendants would have preferred to have Beloney doing a lunchroom manager's work for the lunchroom manager's pay they were giving her, lead us to conclude that race was not the reason why the defendants did not offer her the jobs at Hathaway and Central Elementary. Instead we feel that Beloney was not offered the jobs because the defendants had no reason to suspect that she would be willing to drive so far to get to work. If she was willing to drive that far, it was incumbent upon her to inform the defendants of that fact. We therefore hold that the plaintiff has failed to prove her claim by a preponderance of the evidence.

### E. CLERICAL POSITIONS

■ With regard to clerical positions the plaintiffs again failed to offer statistics showing the comparative success rates of white and black applicants for such jobs between 1970 and August 1976.[86] Their statistics show only that no black clerical employees were hired during that period and that one of the sixteen secretaries in place as of the date suit was filed was black.[87] That is not enough to raise an inference of racial discrimination.

The only other evidence offered was the testimony of plaintiff Dazetta Thorne. She is black and claims the defendants denied her a secretarial job because of her race. The evidence shows that while pregnant, she applied for a position as a secretary with the Jefferson Davis School Board in June 1976. She was neither given an interview nor a job. That is the basis of her claim.

So far as the evidence shows the Jefferson Davis Parish School Board had no openings in its secretarial staff from the time when Ms. Dazetta Thorne applied until three months later in September 1976. At

---

**86.** See Plaintiffs' Exhibit 35, reproduced in the appendix to this opinion.

**87.** See Plaintiffs' Exhibit 55, reproduced in the appendix to this opinion.

that time the defendants hired Mrs. Constance Savoie. Mrs. Savoie is black. Since the only job coming open around the time Ms. Thorne made application was awarded to a black individual, we hold that her claim that she was denied a job because of her race is without merit.

### F. MUSIC TEACHERS

Plaintiffs offered statistics showing that between 1970 and August 1976, the defendants did not hire a single black music teacher.[88] However, the plaintiffs did not offer evidence showing that the defendants had hired any music teachers during that period.[89] Because of that we hold that the statistics offered by plaintiffs do not establish a prima facie case of employment discrimination.

The only plaintiff who testified about being denied a music teacher's job because of his race was a class member named Don MacZeal. MacZeal is a black music teacher who claims that he applied for a job with the Jefferson Davis School system sometime between his graduation from McNeese University in December of 1975 and the summer of 1976. He claims he applied by sending a letter to the School Board. He never heard from the school board nor did he contact them.

The School Board however had no record of that application. They had records of every other application relevant to this suit, including two later applications which MacZeal had sent in 1978 and 1980. Because of that and the genuine uncertainty about sending the first letter which MacZeal demonstrated on the witness stand, we have serious doubts about whether MacZeal's memory of sending the letter is accurate and if it is whether the defendants ever received it. That, when paired with the failure of MacZeal to show that the defendants had an opening for a music teacher

when he allegedly applied, leads us to hold that he failed to establish a prima facie case that he had been denied a job because of his race. *McDonnell Douglas, supra.*

### G. POSITIONS NEVER SOUGHT

Jackie Hayes and Willie Renee Goodly are black teachers who have been employed by the Jefferson Davis Parish School Board. They each testified during the trial that they were interested in administrative positions in the parish and were authorized to hold such positions, but never made application for any of the administrative jobs which came open because of the defendants' discriminatory employment practices. In *Teamsters v. U. S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court recognized that a person could have a claim under Title VII even though he never applied for a position. However in commenting upon such a claim, the Court noted that "[b]ecause he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices." *Id.* at 367–368, 97 S.Ct. at 1870–1871.

Of course, a necessary prerequisite to such a claim is a showing that the employer engaged in discriminatory practices on such a routine basis that an application from a member of the group discriminated against would have been futile. There has been no such showing in this case. Plaintiffs' unsubstantiated belief is no substitute. We therefore find that the claims of Hayes and Willie Renee Goodly are without merit.

### H. CLASS CLAIMS

Having found that all of the evidence presented in connection with individual plaintiffs failed to prove that any of them were denied jobs because of their

---

**88.** See Plaintiffs' Exhibit 35, reproduced in the appendix to this opinion.

**89.** Plaintiffs' statistics did show that of the ten music teachers in place at the time suit was

filed, only one was black. See Plaintiffs' Exhibit 55, reproduced in the appendix to this opinion.

race, our consideration of plaintiffs' class claims is limited to the question of whether the statistics offered by plaintiffs support the conclusion that blacks as a class were denied jobs in the Jefferson Davis Parish School System because of their race.

As has been noted, the statistics offered by the plaintiffs are not particularly informative. For no job at issue do the statistics reveal whether there were black applicants for the jobs awarded between 1970 and August, 1975. The statistics based on decisions made during what plaintiffs claim is the most relevant year, 1976, are based on such small sample sizes that had one or two blacks been chosen instead of whites the "startling" disparities plaintiffs refer to would not have existed at all. Insofar as the music teachers, lunchroom managers and secretarial positions are concerned, the statistics offered by the plaintiffs tell us even less. They do not reveal the number of jobs filled in those categories during the six year period prior to suit and as a consequence shed no light on the question of whether whites seemed to be favored over the plaintiffs. When we view the generally uninformative statistics of the plaintiffs in light of the fact that they failed to show that blacks were excluded from any category of job from the time of integration, we have serious cause to doubt whether the plaintiffs presented evidence permitting us to find that "racial discrimination was the [school board's] standard operating procedure—the regular rather than the unusual practice." *Teamsters, supra* at 336, 97 S.Ct. at 1855.

Assuming however, that plaintiffs' statistics do suggest that generally the defendants discriminated against blacks, we find that that suggestion evaporates in the path

of the entirely convincing evidence presented by the defendants. With regard to statistics, those offered by the defendants and the analysis which accompanied them, were of a superior quality both in terms of accuracy and what they revealed about the impact of the defendants' employment policies on blacks.[90] Using a method of statistical analysis modeled after the one employed by the Supreme Court in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) and *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the defendants' expert, Dr. Hill,[91] found that for each job and job category at issue in this case, the employment decisions made by the Jefferson Davis Parish School Board between August, 1975 and trial, had a statistically neutral impact upon blacks. The analysis revealed that the number of blacks hired in each job category was not significantly different from that which would have been expected had a totally random selection process been used. Because of that, the conclusion that race had been a factor in the decision making process actually employed is not warranted.

When we add the defendants' testimony to the statistics they offered, we are convinced that they endeavored in good faith not only to be fair to blacks but also made efforts not required by Title VII or any other law, to seek out competent black teachers.[92] From their testimony, we found the defendants to be sincere individuals whose primary objective was the competent, efficient, and racially harmonious management of an admirably integrated public school system.[93] They did not strike us as men so ignorant as to reject competent black applicants who could help them

---

**90.** See Defendants' Exhibit 115, reproduced in the appendix to this opinion.

**91.** Dr. Robert R. Hill is an Assistant Professor in the Department of Business Analysis, College of Business Administration, Texas A&M University. He was accepted as an expert in statistical analysis by this court.

**92.** See, e. g. n. 70, *supra.*

**93.** Since the schools in Jefferson Davis Parish were desegregated, twenty-five percent of the students and faculty at each school in the parish has been black. Even the plaintiffs concede that the School Board has done an admirable job in maintaining the schools on an integrated basis.

achieve that objective simply because they were black. In contrast, we perceived the plaintiffs generally as a group who felt or were convinced that Title VII could be a substitute or a tool for ambition. It is not. It is designed to provide redress for opportunity denied by a most sinister barricade of ignorance. We found no barricades erected by the defendants in this case. We accordingly hold that plaintiffs' class claims are without merit.

## II. DISPARATE IMPACT

■ Because discriminatory motive need not be shown under a theory of disparate impact, it is a theory which is not available in this Circuit to support claims of employment discrimination brought pursuant to any provision other than Title VII. *See Williams v. DeKalb County*, 582 F.2d 2, 2–3 (5th Cir. 1978) (§§ 1981 and 1983 actions require same showing of discriminatory intent as is required for Constitutional claims). A claim of disparate impact is dependent upon a showing that the employer utilized some facially neutral practice in making employment decisions which tended to have a disproportionate exclusionary impact upon members of groups protected by Title VII. From our review of relevant cases, it seems to us that the plaintiffs in this case could establish a prima facie case of disparate impact with evidence showing that: (1) they were members of a group protected by Title VII; (2) the defendants utilized some procedure for purposes of soliciting, screening and selecting prospective employees which excluded people from consideration for particular jobs for reasons other than race; (3) the procedure so used excluded black individuals at a rate significantly greater than white individuals; and (4) the plaintiffs were excluded by that procedure. *See generally, Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1979); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

To prove their claim of disparate impact the plaintiffs have offered statistics showing that blacks received fewer jobs than whites and that the success rate of blacks who applied for jobs was less than the success rate of whites. Although plaintiffs' statistics show disparities between the success rates of whites and blacks, plaintiffs offered no evidence permitting us to conclude that those disparities were attributable to anything other than the fact that when given the choice between qualified white and black applicants for a job, the defendants tended to choose a qualified white applicant. To the extent which that tendency raises the inference that the defendants' decisions may have been influenced by race, we have already determined that for each job where a qualified black teacher applied and a qualified white applicant was chosen, the defendants demonstrated that they had a legitimate non-racial reason for the selection of the white applicant. Plaintiffs cannot support their claim of disparate impact upon disparities resulting from the proper exercise of an employer's discretion to choose between qualified applicants for a job. *See, Burdine supra.* We therefore find that plaintiffs' claim of disparate impact is without merit.

## III. CONCLUSION

After thoroughly reviewing the evidence presented in this case, we have concluded that none of the plaintiffs' claims have been proven by a preponderance of the evidence. We accordingly enter judgment in favor of the defendants, and dismiss all of the plaintiffs' claims at their cost.

APPENDIX

EXHIBIT P-35

A COMPARISON OF PROMOTIONS AND NEW HIRES OF BLACKS
DURING THE PERIOD AFTER MARCUS GORDON DECISION JUNE 8, 1970
TO DATE OF FILING SUIT AUGUST 31, 1976 WITH THE PERIOD AFTER
FILING SUIT AUGUST 31, 1976 TO PRESENT DATE SEPT. 8, 1980*

| Position | Number of Blacks Promoted or hired June 8, 1970 to Aug. 31, 1976 (6 yr. period) | Number of Blacks Promoted or hired Aug. 31, 1976 to Sept. 8, 1980 (4 yr. period) | Total no. of Blacks Promoted or hired |
|---|---|---|---|
| Principals | 0 | 4 | 4 |
| Coaches (head) Football and Basketball | **1 | 0 | 1 |
| Coaches (assistant and track) | **2 | 8 | 10 |
| Music Teachers | 0 | 2 | 2 |
| Central office and school secretaries, bookkeepers,etc. | 0 | 4 | 4 |
| Lunchroom Managers | 1 | 2 | 3 |
| Total | 4 | 20 | 24 |

*There were no blacks promoted or hired into any of these positions during the full one year period before suit filing (with the exception of Robert Allen)

**Same individual, Robert Allen, who served as assistant coach, 1973-76 and head basketball coach August of 1976 to date.

Denotes Blacks

EXHIBIT P-54 (Flow Chart)

PROMOTIONS AND NEW HIRES WITHIN JEFFERSON DAVIS
PARISH SCHOOL BOARD SYSTEM FROM MARCUS GORDON DECISION
June 8, 1970 UNTIL INSTITUTION OF PRESENT SUIT AUGUST 31, 1976.
THE SYSTEM IS COMPOSED OF 75% WHITE PERSONNEL 25% BLACK PERSONNEL

| Position | Total No. of new hires and promotions in position | Number of Whites | Number of Blacks | Percentage Whites | Percentage Blacks |
|---|---|---|---|---|---|
| Superintendents and Supervisors | **9 | **8 | 1 | 88.89 | 11.11 |
| Directors and Coordinators | 5*** | 4*** | 1 | 80.00 | 20.00 |
| Principals High School | 7 | 7 | 0 | 100.00 | 0.00 |
| Principals Jr. High | 0 | 0 | 0 | 0.00 | 0.00 |
| Principals Elementary | 3 | 3 | 0 | 100.00 | 0.00 |
| Coaches Head | 19 | 18 | *1 | 94.74 | 5.26 |
| Coaches Assistant | 26 | 24 | *2 | 92.31 | 7.69 |
| Totals | 69 | 64 | 5 | 92.75 | 7.25 |

*Denotes same individual, Robert
Allen, hired as assistant coach
1973-76. Head basketball coach
August of 1976.

Denotes Whites Denotes Blacks

**Does not include promotion of one
white, Marie Watson, to supervisor
of food services.

***Includes one reading coordinator
1971-73 Dr. Myrna Stuart (white)
and should be stricken.

EXHIBIT P-55 (Static Chart)

CONDITIONS EXISTING WITHIN JEFFERSON DAVIS PARISH IMMEDIATELY BEFORE INSTITUTION OF SUIT AUGUST 31, 1976. THE SYSTEM IS COMPOSED OF 75% WHITE PERSONNEL, 25% BLACK PERSONNEL.

| Position | Total Number In Position | Number of Whites | Number of Blacks | Percentage Whites | Percentage Blacks |
|---|---|---|---|---|---|
| Superintendents and Supervisors* | 7 | 6 | 1 | 85.72 | 14.28 |
| Directors and Coordinators | 4 | 3 | 1 | 75.00 | 25.00 |
| Principals High Schools | 7 | 7 | 0 | 100.00 | 0.00 |
| Principals Jr. High | 2** | 2** | 0** | 100.00 | 0.00 |
| Principals Elementary | 6 | 4 | 2 | 66.67 | 33.33 |
| Coaches Head | 18 | 17 | 1 | 94.44 | 6.56 |
| Coaches Assistant | 20 | 19 | 1 | 95.00 | 5.00 |
| Music Teachers | 10 | 9 | 1 | 90.00 | 10.00 |
| Central Office secretaries, bookkeepers, etc. | 8 | 8 | 0 | .100.00 | 0.00 |
| School Secretaries | 16 | 15 | 1 | 93.75 | 6.25 |
| Lunchroom Managers | 13 | 12 | 1 | 92.31 | 7.69 |

Denotes Whites Denotes Blacks *White maintenance
 supervisor excluded.

**Does not include one black
 W. N. Levingston at Elton
 Jr. High counted as
 elementary.

DEFENDANT'S
EXHIBIT
D-115

An Analysis of Personnel Statistics
of Jefferson Davis Parish School District

By

Robert R. Hill, PhD
Assistant Professor
Department of Business Analysis
College of Business Administration
Texas A&M University
College Station, Texas 77843

CI 76-0922
(CASE NO.)

U. S. DISTRICT COURT
WESTERN DISTRICT OF LA.
FILED IN EVIDENCE

Sept 24. 1980
(DATE)

ROBERT H. SHEMWELL, CLERK

BY
DEPUTY

The following analyses are based on personnel statistics furnished by the Jefferson Davis Parish School Board, and on statistics developed by the 1970 census.

The analyses have the purpose of determining if Blacks have been significantly adversely affected in the selection processes for:

1) Administrative Staff, Principals and Assistant Principals
2) Lunch Room Managers
3) Coaches
4) Music Teachers
5) Clericals

In addition, the analyses have the purpose of determining if females have been significantly adversely affected in the selection processes for administrative staff, principals and assistant principals.

For most of the analyses that follow a common format is used.

1. A comparison is defined between the class and non-class members.

2. A "P" value is calculated. A "P" value is the probability that the class would do as well as it did or worse if the process being examined were completely random.

 If "P" is small [near zero] then the inference of significant adverse impact on the class is supported. Commonly "P" must be smaller than .0228 in order for it to be considered small and for the conclusion of significant adverse impact on the class to be reached.

3. The number of equivalent standard deviations from expected is calculated. The tests presented in this report are one-tail tests. If the equivalent standard deviation is less than −2 or −3 then the conclusion of statistically significant adverse impact on the class is supported. An equivalent standard deviation from expected of −2 is associated with a "P" value of .0228. An equivalent standard deviation of −3 is associated with a "P" value of .0013.

Loosely speaking, a "P" value of approximately .5 and an equivalent standard deviation of 0.0 are associated with the class achieving the outcomes that are expected when the process being examined is random [or neutral] with respect to the class.

## SUMMARY

None of the tests performed comparing Blacks to Non-Blacks or Females to Males had a "P" value less than .0227 or an equivalent number of standard deviations less than −2.

The tests performed do not support the conclusion that Blacks are being significantly adversely impacted by the selection processes examined.

The tests do support the conclusion that Blacks are achieving results at least equivalent to non-Blacks in the selection processes examined.

The tests performed do not support the conclusion that females are being significantly adversely impacted in the selection process for administrative staff positions, principal positions or assistant principal positions.

The tests do support the conclusion that females are achieving results at least equivalent to males in the selection process examined.

## BLACKS

### Administrative Staff, Principals, Assistant Principals

The first table focuses on the self-selection process of applying for these positions in order to determine if Blacks have not been applying for these positions in proportions equal to their proportion of the qualified Jefferson Davis Parish School Board employees.

This table compares the number of applications for these positions by Blacks and Whites that were made by employees of Jefferson Davis Parish School Board and who were certified by Louisiana as qualified for these positions. Blacks applied at rates slightly lower than non-blacks.

The next four tables compare the success rates by Blacks and Whites who applied for positions as:

1) Administrative Staff
2) Principals
3) Assistant Principals
4) Total.

Each of these tables display the number of applications by Black and White that resulted in a promotion and the numbers of applications by Black and White that did not result in promotion. The tests performed on these data support the conclusion of no statistically significant adverse impact on Blacks in the selection process for these positions.

## Lunch Room Managers

The three tables given show the number of employees of Jefferson Davis Parish School Board who were qualified as lunch room managers but who were not lunch room managers. This is the pool from which lunch room manager positions were filled. The tables break the qualified pool into those promoted and those not promoted.

There is a table for each of the three times persons were promoted to lunch room managers since 8–30–75. For each of the three times promotions were made, the tests performed do not support the conclusion that Blacks are significantly adversely impacted by the selection process.

During this period, there were two (2) Black individuals who were qualified and who were not lunch room managers for part of the period. Both were promoted to lunch room manager since 8–30–75.

During this period there were eleven (11) White individuals who were qualified and who were not lunch room managers for part of the period. Of the eleven, four were promoted to lunch room manager and one was demoted from lunch room manager.

The success rate for Blacks was 100 percent, while for Whites the success rate was approximately 40 percent.

## Coaches

To examine the process of coach selection by the Jefferson Davis Parish School District subsequent to 8–30–75, three comparisons were made.

The first comparison compares the success rates of Blacks and Whites who applied for positions as coaches with the District. There were a total of 51 Black applicants and 173 White applicants. Of the 53 hired, 8 were Black and 45 were White. If 53 of the 224 total applicants were selected at random to fill the 53 jobs, the probability that Blacks would receive 8 or fewer jobs is approximately .0895 and consequently the conclusion that the selection of coaches is a non-random process that significantly adversely impacts Blacks is not supported. The number of standard deviations from the expected value is −1.34 which is well within 2 standard deviations.

Two other "pools" from which coaches could have been drawn were examined. The "pools" were:

1) Applicants for coaching positions plus those employees with coaching experience who are not currently coaching

2) Applicants for coaching positions plus those employees with coaching experience who are not currently coaching plus those employees with physical education degrees but who have no coaching experience

For neither of these pools is the conclusion of a statistically significant adverse impact on Blacks supported.

## Music Teachers

To examine the selection process for music teachers, the number of Black and White applicants for music teacher were compared to the number of Black and White music teachers hired. The "P" value of .51 and the number of equivalent standard deviations of + .03 do not support the conclusion that Blacks are statistically significantly adversely impacted by the music teacher selection process.

### Clericals

Two comparisons were made for clericals. The first compares the hire rates of Black and White applicants. The results of this comparison is a "P" value of .04897 and an equivalent number of standard deviations from the expected value of −1.65. These results do not support the conclusion that the selection process for clericals is statistically significantly adversely impacting Blacks.

The second comparison is of the make up of the clerical work force in Jefferson Davis Parish and in the Lake Charles SMSA. This comparison shows that while the school district's clerical staff has ranged from about 13 percent Black to about 17 percent Black, the percent of clericals who were Black in all of Jefferson Davis Parish in 1970 was 4.57 percent and was 6.58 percent in the Lake Charles SMSA. The proportion of clerical workers employed by the Jefferson Davis Parish School District is larger than either of the logical relevant labor markets from which the clericals could be drawn.

### FEMALES

Comparisons were made of the proportion of applications by females and males that resulted in hires or promotions for administrative staff, principals and assistant principals. The results of the comparisons are that the conclusion that females were being statistically significantly adversely impacted by the selection processes is not supported. The conclusion that females are being successful in the applications for promotion or hire into these positions at rates at least equal to males is supported.

Administrative Staff, Principals and Assistant Principals
Comparison of Application Rates for Certified Blacks and
Whites at Jefferson Davis Parish from 8-30-75 to Present

| | On Certified List | Number of Applications Made by Individuals on Certified List |
|---|---|---|
| Black | 31 | 27 |
| White | 92 | 86 |

On average a Black on the certified list made .8710 applications. On average a White on the certified list made .9348 applications.

Using a two sample t test, the number of standard deviations from the expected is approximately -.19 The probability of this outcome or an outcome less favorable to Blacks occurring by chance when the average application rates are equal for Blacks and Whites is approximately .425

Comparison of Success Rates of Blacks to Whites in
Applying for Administrative Staff, Principal and Assistant
Principal Positions (8-30-75 to present)

Administrative Staff

| | Not Promoted | Promoted | Total |
|---|---|---|---|
| Black | 9 | 1 | 10 |
| White | 26 | 5 | 31 |
| | 35 | 6 | 41 |

P = .705

The number of equivalent standard deviations from expected is approximately +.54.

### Principals

| | Not Promoted | Promoted | Total |
|--------|:------------:|:--------:|:-----:|
| Black | 12 | 4 | 16 |
| White | 38 | 7 | 45 |
| | 50 | 11 | 61 |

P = .8869

The number of equivalent standard deviations from expected is approximately +1.21.

### Assistant Principals

| | Not Promoted | Promoted | Total |
|--------|:------------:|:--------:|:-----:|
| Black | 2 | 2 | 4 |
| White | 11 | 7 | 18 |
| | 13 | 9 | 22 |

P = .834

The number of equivalent standard deviations from expected is approximately +.97.

**Comparison of Success Rates of Blacks to Whites in Applying for Administrative Staff, Principal and Assistant Principal Positions (8-30-75 to Present) continued**

### Total

| | Not Promoted | Promoted | Total |
|--------|:------------:|:--------:|:-----:|
| Black | 23 | 7 | 30 |
| White | 75 | 19 | 94 |
| | 98 | 26 | 124 |

P = .739

The number of equivalent standard deviations from expected is approximately +.64.

Lunch Room Managers
Qualified but not in Lunch Room Manager Position

September 1976

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 1 | 0 | 1 | |
| White | 7 | 2 | 9 | P = .80 |
| | 8 | 2 | 10 | Z = +.77 |

September 1978

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 1 | 1 | 2 | |
| White | 9 | 0 | 9 | P = 1.00 |
| | 10 | 1 | 11 | Z = ∞ |

September 1980

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 0 | 1 | 1 | |
| White | 7 | 2 | 9 | P = 1.00 |
| | 7 | 3 | 10 | Z = ∞ |

Coaches
Comparison of Applications with Hires
August 30, 1975 to present

| | Not Hired | Hired | Total |
|---|---|---|---|
| Black | 43 | 8 | 51 |
| White | 128 | 45 | 173 |
| | 171 | 53 | 224 |

P = .0895

The number of standard deviations from expected is approximately −1.34.

Comparison of the numbers of Black and White applicants who specify coaching with the numbers of Black and White hires as coaches

| | Not Hired | Hired | Total |
|--------|-----------|-------|-------|
| Black | 16 | 8 | 24 |
| White | 63 | 45 | 108 |
| | 79 | 53 | 132 |

P = .3035

The number of standard deviations from expected is approximately -.52

Comparison of the proportion of coaches hired who were Black to .25

 The actual number of Black hires was 8.
 The expected number of Black hires is (.25)*(53) = 13.25.
 The number of standard deviations from expected
 assuming that 25% of coach hires should be
 Black is approximately -1.665.

Coaches

Applications plus coaching experience
(not currently coaching) compared with Hires

Pool

| | Not made Coach | Made Coach | Total |
|--------|----------------|------------|-------|
| Black | 58 | 8 | 66 |
| White | 150 | 45 | 195 |
| | 208 | 53 | 261 |

Black % made coach = .121
White % made coach = .231
Total % made coach = .203

P = .0375

number of standard deviations is -1.78

## Coaches

Applications plus those with coaching experience
who are not currently coaching plus P.E. degrees
without coaching experience compared with hires

### Pool

| | Not Made Coach | Made Coach | Total |
|---|---|---|---|
| Black | 63 | 8 | 71 |
| White | 168 | 45 | 213 |
| | 231 | 53 | 284 |

Black % made coach = .113
White % made coach = .211
Total % made coach = .187

P = .0433
number of standard deviations is -1.71

### Music Teachers
Comparison of Applicant Flow to Hires.
8-30-75 to Present

| | Not Hired | Hired | Total |
|---|---|---|---|
| Black | 18 | 2 | 20 |
| White | 64 | 10 | 74 |
| | 82 | 12 | 94 |

P = .51
Z = +.03

### Clericals
8-30-75 to Present

#### Applicants

| | Not Hired | Hired | Total |
|---|---|---|---|
| Black | 69 | 2 | 71 |
| White | 115 | 13 | 128 |
| | 184 | 15 | 199 |

P = .04897
The number of standard deviations from the expected value is -1.65

## Comparison of Clerical Work Force
## to Relevant Labor Market Statistics

| | | | | | Jefferson Davis Parish | | Lake Charles SMSA |
|---|---|---|---|---|---|---|---|---|
| School Year | Total Clerical | Black | Percent Black | P | Z equivalent | P | Z equivalent |
| 1975–76 | 23 | 3 | 13.04 | .9808 | + 2.08 | .9392 | + 1.55 |
| 1976–77 | 24 | 4 | 16.67 | .9959 | + 2.64 | .9817 | + 2.09 |
| 1977–78 | 23 | 4 | 17.39 | .9966 | + 2.71 | .9847 | + 2.16 |
| 1978–79 | 23 | 4 | 17.39 | .9966 | + 2.71 | .9847 | + 2.16 |
| 1979–80 | 24 | 4 | 16.67 | .9959 | + 2.64 | .9817 | + 2.09 |

For Jefferson Davis Parish, the 1970 census reported that 40 of 876 clericals were Black. The percentage of Black clericals in Jefferson Davis Parish was 4.57. This percentage is being used above to compare to the percent of Black clerical workers employed by the Jefferson Davis Parish Schools.

For the Lake Charles SMSA, the 1970 census reported that 468 of 7110 clericals were Black. The percentage of Black clericals in the Lake Charles SMSA was 6.58. This percentage is being used above to compare to the percent of Black clerical workers employed by the Jefferson Davis Parish Schools.

### Summary Test of Selected Comparisons of the Effects of Personnel Policies on Black in the Jefferson Davis Parish School District

| Test | "P" | -2 ln P |
|---|---|---|
| Administrative Staff, Principal and Assistant Principal | | |
| Certified vs Applied | .504 | 1.370 |
| Applied vs Promoted | | |
| Administrative Staff | .705 | .699 |
| Principals | .8869 | .240 |
| Assistant Principals | .834 | .363 |

| Test | "P" | -2 ln P |
|------|-----|---------|
| Lunch Room Managers | | |
| September 1976 | .800 | .446 |
| September 1978 | 1.000 | 0.000 |
| September 1980 | 1.000 | 0.000 |
| Coaches | .0895 | 4.827 |
| Music Teachers | .510 | 1.347 |
| Clericals | .04897 | 6.032 |
| | | 15.324 |

$$P \ (15.324 \leq X^2_{20}) = .757$$

Comparison of Success Rates of Females to Males Applying for Administrative Staff, Principal, and Assistant Principal Positions

Administrative Staff

| | Not Promoted | Promoted | Total |
|------|------|------|------|
| Female | 7 | 1 | 8 |
| Male | 28 | 5 | 33 |
| | 35 | 6 | 41 |

$P = .6046$

The number of equivalent standard deviations from expected is approximately +.26.

Principals

| | Not Promoted | Promoted | Total |
|------|------|------|------|
| Female | 4 | 1 | 5 |
| Male | 46 | 10 | 56 |
| | 50 | 11 | 61 |

$P = .7820$

The number of equivalent standard deviations from expected is approximately +.78.

### Assistant Principals

| | Not Promoted | Promoted | Total |
|--------|-------------|----------|-------|
| Female | 3 | 1 | 4 |
| Male | 10 | 8 | 18 |
| | 13 | 9 | 22 |

P = .4496

The number of equivalent standard deviations from expected is approximately -.13.

Comparison of Success Rates of Females to Males in Applying for Administrative Staff, Principal and and Assistant Principal Positions (8-30-75 to present)

### Total

| | Not Promoted | Promoted | Total |
|--------|-------------|----------|-------|
| Female | 14 | 3 | 17 |
| Male | 84 | 23 | 107 |
| | 98 | 26 | 124 |

P = .501

The number of equivalent standard deviations from expected is approximately +.02.

Comparison on a Position-by-Position Basis of the Promotions into Administrative Staff, Principals and Assistant Principals at Jefferson Davis Parish School District from 8-30-75 to present
(includes only those Positions for Which both Blacks and Whites Applied)

#### Administrative Staff

Assistant Superintendent (1976-77)

| | Not Promoted | Promoted | Total |
|-------|-------------|----------|-------|
| Black | 2 | 0 | 2 |
| White | 4 | 1 | 5 |
| | 6 | 1 | 7 |

P = .714

-2 ln P = .6737

Supervisor of Secondary Education (1976-77)

| | Not Promoted | Promoted | Total |
|---------|--------------|----------|-------|
| Black | 3 | 0 | 3 |
| White | 7 | 1 | 8 |
| | 10 | 1 | 11 |

P = .636

-2 ln P = .9051

Supervisor of Child Welfare and Attendance (1976-77)

| | Not Promoted | Promoted | Total |
|---------|--------------|----------|-------|
| Black | 2 | 0 | 2 |
| White | 8 | 1 | 9 |
| | 10 | 1 | 11 |

P = .818

-2 ln P = .4018

Supervisor of Special Education (1979-80)

| | Not Promoted | Promoted | Total |
|---------|--------------|----------|-------|
| Black | 1 | 0 | 1 |
| White | 7 | 1 | 8 |
| | 8 | 1 | 9 |

P = .889

-2 ln P = .2353

## Principals

Jennings H.S. (1976-77)

| | Not Promoted | Promoted | Total |
|---------|--------------|----------|-------|
| Black | 1 | 0 | 1 |
| White | 2 | 1 | 3 |
| | 3 | 1 | 4 |

P = .75

-2 ln P = .5754

Lacassine H.S. (1976-77)

| | Not Promoted | Promoted | Total |
|---------|--------------|----------|-------|
| Black | 3 | 0 | 3 |
| White | 2 | 1 | 3 |
| | 5 | 1 | 6 |

P = .50

-2 ln P = 1.386

Central Elementary School (1977-78)

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 0 | 1 | 1 | |
| White | 6 | 0 | 6 | P = 1.00 |
| | 6 | 1 | 7 | -2 ln P = 0.00 |

Ward Elementary School (1976-77).

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 1 | 0 | 1 | |
| White | 6 | 1 | 7 | P = .875 |
| | 7 | 1 | 8 | -2 ln P = .2671 |

Lake Arthur Elementary School (1976-77)

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 1 | 0 | 1 | |
| White | 4 | 1 | 5 | P = .833 |
| | 5 | 1 | 6 | -2 ln P = .3654 |

Elton Jr. H.S. (1978-79)

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 2 | 1 | 3 | |
| White | 4 | 0 | 4 | P = 1.00 |
| | 6 | 1 | 7 | -2 ln P = 0.00 |

Elton Jr. H.S. (1980-81)

| | Not Promoted | Promoted | Total | |
|---|---|---|---|---|
| Black | 1 | 1 | 2 | |
| White | 4 | 0 | 4 | P = 1.00 |
| | 5 | 1 | 6 | -2 ln P = 0.00 |

Fenton H.S. (1978-79)

| | Not Promoted | Promoted | Total |
|---|---|---|---|
| Black | 1 | 0 | 1 |
| White | 4 | 1 | 5 |
| | 5 | 1 | 6 |

P = .833

-2 ln P = .3654

Welsh-Roonoke Jr. H.S. (1978-79)

| | Not Promoted | Promoted | Total |
|---|---|---|---|
| Black | 1 | 0 | 1 |
| White | 4 | 1 | 5 |
| | 5 | 1 | 6 |

P = .833

-2 ln P = .3654

## Assistant Principals

Jennings H.S. (1976-77)

| | Not Promoted | Promoted | Total |
|---|---|---|---|
| Black | 1 | 1 | 2 |
| White | 2 | 1 | 3 |
| | 3 | 2 | 5 |

P = .900

-2 ln P = .2107

Lake Arthur H.S. (1976-77)

| | Not Promoted | Promoted | Total |
|---|---|---|---|
| Black | 1 | 0 | 1 |
| White | 1 | 1 | 2 |
| | 2 | 1 | 3 |

P = .667

-2 ln P = .8099

Jennings H.S. (1978-79)

| | Not Promoted | Promoted | Total |
|---|---|---|---|
| Black | 0 | 1 | 1 |
| White | 1 | 0 | 1 |
| | 1 | 1 | 2 |

P = 1.000

-2 ln P = 0.00

$\epsilon$ -2 ln P = 6.570

$P(X_{32}^2 \geq 6.5705) = .9999$

Formulas Used in Analyses

1. Two Sample t test - Compares the averages or means
 of two populations

 $$Ho: \quad \mu_1 \geq \mu_2$$

 $$Ha: \quad \mu_1 < \mu_2$$

 Test used is:

 $$t = \frac{\overline{X}_1 - \overline{X}_2}{\left[\frac{(n_1-1)S_1^2 + (n_2-1)S_2^2}{(n_1 + n_2 - 2)} \left(\frac{1}{n_1} + \frac{1}{n_2}\right)\right]^{\frac{1}{2}}}$$

 Compare to $- t_{n_1+n_2-1 \, , \, .0228}$

2. Fisher Exact test - compares the promotion rates of
 applicants

 Procedure:

 | | Not Promoted | Promoted | Total |
 |-------|--------------|----------|-------|
 | Black | $n_1 - x_1$ | $x_1$ | $n_1$ |
 | White | $n_2 - x_2$ | $x_2$ | $n_2$ |
 | | $n - x$ | $x$ | $n$ |

 $$P = \frac{\sum_{i=0}^{x_1} \binom{n_1}{i} \binom{n_2}{x_2 + x_1 - i}}{\binom{n}{x}}$$

 P is the probability if x promotions are to be given
 to randomly selected individuals that $x_1$ or fewer will be
 given to Blacks.

3. Chi-Square Summary Test

$$X^2_{\text{calculated}} = \sum_{i=1}^{k} -2 \ln P$$

$P = P(X^2_{\text{calculated}} \leq X_{2k})$ - That is, the larger $X^2_{\text{calculated}}$, the stronger the indication that the set of tests being summarized are drawn from situations in which the minority class is being adversely impacted by the processes being examined. This test is important because it can detect, in a set of tests, a pattern of adverse impact even though each individual test is not indicative of statistically significant adverse impact.

For example, if 15 individual tests of significant adverse impact were performed and each resulted in a "P" value of $.135$, we would conclude that for each of the tests individually the employment practice being examined was neutral in its impact.

If we summarize the results of these test using $X^2_{\text{calc}} = \sum -2 \ln P$ we get a $X^2_{\text{calc}} = 58.98$ The P value is $.00122$ This is approximately $3.03$ standard deviations from the expected value and hence would tend to support the hypothesis that the set of 15 practices is statistically significantly adversely impacting the protected class.